132 F.3d 36
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
William D. HELDENBRAND, Plaintiff-Appellant,
v.
Shirley S. CHATER, Defendant-Appellee.
 No. 96-3971.
 United States Court of Appeals, Seventh Circuit.
 Argued June 11, 1997.
Decided Dec. 15, 1997.
 
 Appeal from the United States District Court for the Southern District of Illinois, No. 94-C-4174-JLF; James L. Foreman, Judge.
 Before POSNER, Chief Judge, MANION and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Plaintiff William D. Heldenbrand, a 51 year old welder,[1] was denied social security benefits. He alleged injuries to his right and left hands or wrists, his left foot, a finger amputation and repair on his left hand, hearing loss, chest pain, and back pain.
 
 
 2
 Because Heldenbrand was near the age of 55 at the time of the January 10, 1994 decision, Administrative Law Judge Lawrence E. Shearer ruled that Heldenbrand was entitled to benefits as of that date. See 20 C.F.R. pt. 404, subpt. P.App.2, rules 202.01, 202.02. However, he denied benefits prior to that date, finding at step five that Heldenbrand could perform light work.
 
 
 3
 The Appeals Council denied review. In the district court, a magistrate judge issued a Report and Recommendation concluding that the ALJ erred in finding Heldenbrand retained the residual functional capacity to work, and recommending that the Commissioner's final determination be reversed. The district court disagreed, and instead affirmed the Commissioner's decision.
 
 Adversarial Nature of Proceeding
 
 4
 As we will detail below, we are disturbed that Heldenbrand was repeatedly questioned by the ALJ in precisely the type of adversarial manner that is not appropriate in such hearings particularly where, as here, the claimant is not represented by an attorney, and it is well-documented that he does not have the education or sophistication to understand many of the procedural and substantive aspects of the proceedings. See Thompson v. Sullivan, 933 F.2d 581, 586 (7th Cir.1991) ("AL's manner of questioning might have been appropriate for cross-examination in an adversary proceeding, but insufficient for an ALJ with the heightened duty, to an unrepresented claimant, to develop the record by scrupulously and conscientiously probing for all relevant facts"). This case, like Thompson, involves a claimant who is inarticulate, and has a limited education. "Superficial questioning of inarticulate claimants or claimants with limited' education is likely to elicit responses which fail to portray accurately the extent of their limitations." Thompson, 933 F.2d at 586, quoting Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1052 (6th Cir.1983). Moreover, although Heldenbrand was represented at the hearing, the representative was not an attorney and played a limited role.
 
 
 5
 The agency proceedings are not intended to be adversarial in nature. Sullivan v. Hudson, 490 U.S. 877, 891 (1989); Kendrick v. Shalala, 998 F.2d 455, 456 (7th Cir.1993). The procedures before the ALJ are informal, evidentiary rules do not apply, and the ALJ has the duty of developing a complete record. Kendrick, 998 F 2d at 456. Here, the ALJ could have easily explored further to resolve several crucial questions. See Smith v. Secretary of Health, Education and Welfare, 587 F.2d 857, 860 (7th Cir.1978) ("[i]t is a basic obligation of the ALJ to develop a full and fair record") Instead, the ALJ appeared to have preconceived notions about Heldenbrand's claims, and the record gives us the distinct impression that he was somewhat antagonistic, unnecessarily abrupt, even at times accusatory, in his questioning.
 
 Credibility
 
 6
 In general, the ALJ found Heldenbrand not credible. "The claimant's allegations were somewhat exaggerated and self-serving and not fully credible." (ALJ Decision, p. 8, finding no. 4.) Credibility findings made by an ALJ are typically deferred to, but not--as here--where the credibility findings were based on the AL's misunderstanding of some basic elements of Heldenbrand's medical history and testimony. We cannot sustain credibility findings based on incorrect information or illogical reasoning. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result"). See also Green v. Shalala. 51 F.3d 96, 100-01 (7th Cir.1995); Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.1994).
 
 
 7
 Here, like in Sarchet, the ALJ made "a substantial number of illogical or erroneous statements that bear materially on [his] conclusion that [the claimant] is not totally disabled." Sarchet, 78 F.3d at 307. Thus, instead of a credibility finding, we are reviewing the application of a legal standard (sedentary or light work as defined by the Secretary), to the medical facts, and therefore we give substantial deference, but "not as much deference as a determination of credibility (whether a witness is believable) would be entitled to." Peterson v. Chater, 96 F.3d 1015, 1016 (7th Cir.1996). Moreover, many of the factors relied on by the ALJ in making his credibility determinations were objective factors, rather than subjective factors, and thus we have greater freedom to review those determinations. Herron 19 F.3d at 335.
 
 
 8
 In regard to credibility, we also note that there is not a single suggestion in the extensive medical records that Heldenbrand was viewed by his many physicians as a malingerer. Quite the contrary. For example, on a disability assessment form dated November 22, 1993, Dr. Naam indicated that he believed Heldenbrand had an impairment "which could reasonably be expected to cause the amount of pain and limitation [he] alleges to have." (R.317) On June 23, 1992, Dr. Naam wrote: "He is one of the most complicated cases I have ever seen. I brought him to a hand conference at the Southern Illinois University School of Medicine and he was examined by several experts." (R.472) Undoubtedly, Dr. Naam would not have done so if he harbored even minor doubts about the plausibility of Heldenbrand's complaints of extreme pain. Also, on November 19, 1990, Dr. William B. Kleinman, a hand surgeon, wrote to Dr. Peter C. Weber: "This patient is legitimate" (R. 247)
 
 
 9
 Still, the ALJ could have been presented with testimony that called into doubt the medical professionals who found Heldenbrand credible. Thus, we will explore in more detail the basis of the ALJ's conclusion that Heldenbrand lacked credibility.
 
 Illiteracy
 
 10
 The ALJ strongly criticized Heldenbrand's testimony that he could not read or write, challenging him repeatedly on this issue during the hearing.
 
 
 11
 ALJ: You have a high school diploma, is that correct?
 
 
 12
 CLAIMANT: Yes, sir.
 
 
 13
 Q You can read and write and do simple mathematics?
 
 
 14
 A I can't read or write.
 
 
 15
 Q Well now sir, you have a high school diploma, don't you?
 
 
 16
 A Yes (inaudible).
 
 
 17
 Q You can read a newspaper and understand what's going on in news--
 
 
 18
 A No,I can't.
 
 
 19
 Q Now when did you graduate from high school?
 
 
 20
 A Way back there in say about fifty--well, I don't know really but around fifty or sixty something there, I think. I ain't looked at the diploma (inaudible).
 
 
 21
 Q You were in regular classes, weren't you, sir?
 
 
 22
 A What was that?
 
 
 23
 Q Were you in regular classes?
 
 
 24
 A What do you mean by regular?
 
 
 25
 Q You weren't in any type of special education, were you?
 
 
 26
 A No, none.
 
 
 27
 Q How do you explain that you can't read and write if you have a high school diploma, sir?
 
 
 28
 A Well, I can't and I don't know but they didn't.
 
 
 29
 Q Well, were you able to read and write when you graduated from high school?
 
 A No No, I wasn't
 
 30
 Q You were in the military, weren't you?
 
 A Yes, sir
 
 31
 Q When were you in the military?
 
 
 32
 A Back in '62 or something there I think.
 
 
 33
 Q Now you had your reading materials when you were in the military, weren't--didn't you?
 
 
 34
 A No, they just swore me in St. Louis They didn't have to read nothing.
 
 
 35
 * * *
 
 
 36
 Q Now you had to learn something about the explosive[s] and read something to read [sic]--to learn that, didn't you?
 
 
 37
 A Yes, they, they sent me to school how to handle them, showed me how to handle them.
 
 
 38
 Q Well, part of that was book learning, too, wasn't it?
 
 
 39
 A What?
 
 
 40
 Q You had to read the type of explosives that you were dealing with.
 
 
 41
 A No, they, they, they read them to me, definitely. (R48-50)
 
 
 42
 Heldenbrand also testified, in response to further questioning by the ALJ, that he could not read a TV guide, and instead just changed channels to find out what was on (R.63). Also, he could not read instructions on laundry detergent if he were to wash clothes (R.64).
 
 
 43
 The ALJ returned to the illiteracy question after the VE testified that Heldenbrand could do light work, such as machine tender, machine feeder, machine off-bearer, machine monitor, production inspection, general cleaning, and night watchman positions.
 
 
 44
 ALJ Would these jobs require significant ability to read or write?
 
 
 45
 VE Not significant. The--well, in terms of in, in terms of those numbers why, no, not significant ability
 
 
 46
 Q Would an individual who has performed in the past as a machine welder be expected to be able to read well enough to do these jobs?
 
 
 47
 A Not necessarily--well, I'm not sure I understand your, your question.
 
 
 48
 Q All right. What I'm saying is if an individual has years of experience as a machine welder would that indicate to you from a vocational point of view that the individual could read well enough to do the jobs that you've indicated?
 
 
 49
 A I think the answer to that is yes, because there's not--be very much reading required of any of these jobs.
 
 
 50
 Q That's what I'm trying to find out is what degree and what level of reading is necessary to perform these jobs
 
 
 51
 A Right. [R.78-79]
 
 
 52
 Heldenbrand's age along with an impairment and work experience where he was not using the education he received in the remote past, may seriously affect his classification as disabled under the grids. 20 C.F.R. § 404.1563(c), § 404.1564(b)(1). Because he is "closely approaching advanced age" (50-54), if he were limited to sedentary work (which we discuss later), and found to be illiterate, and "can no longer perform vocationally relevant past work and [has] no transferable skills, a finding of disabled ordinarily obtains ... For this age group, even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment unless relevant work experience reflects use of such education. 20 C.F.R. Part 404, subpt. P, App. 2, § 201.00(g).
 
 
 53
 Illiteracy is defined by the SSA as "the inability to read or write. [S]omeone [is] illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R § 1564(b)(1). One consequence of finding illiteracy is that the claimant who is able to do only sedentary work is considered disabled if he is illiterate. 20 C.F.R. Part 404, subpt. P, App. 2, Table 2. "This is in recognition of the fact that very few sedentary jobs are available in the economy for people who can't read and write, so that an illiterate person who is disabled from performing all but sedentary work is disabled, period." Glenn v. Secretary of Health and Human Services, 814 F.2d 387, 389 (7th Cir, 1987). The category closest to "illiterate" is, "marginal education," which means "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." 20 C.F R. 404.1564(b)(2). Under the grids, a person approaching advanced age, with a marginal educational level, and with a prior work experience of semi-skilled, transferable or non-transferable, is not disabled. 20 C.F.R. Part 404, Subpart P, App. 2, Rules 202.11, 202.12.
 
 
 54
 Despite the uncontradicted testimony, the ALJ indicated in his decision that he did not believe that Heldenbrand was illiterate.
 
 
 55
 I find this to be extremely difficult to believe. He claimed to have completed high school following a normal curriculum and it is unlikely that he could earn a high school diploma and regular classes [sic] if he were truly unable to either read or write. (ALJ Decision, p. 4)
 
 
 56
 In regard to the ALJ's finding that Heldenbrand could not be illiterate if he received a high school diploma, it is improper for an ALJ to simply guess whether a high school graduate can also be illiterate (particularly in regard to an unknown school system in an unknown town in the late 1950's, when Heldenbrand received his diploma). The United States Department of Education released data in 1994 indicating that as many as one quarter of all high school graduates are completely or functionally illiterate.[2] As we have previously noted, in making illiteracy determinations "the quality and (more important) standards of some American schools today" cannot be ignored. Glenn, 814 F.2d at 390 Statistics such as this support the SSA rule prohibiting reliance on only a numerical grade level to determine a claimant's literacy, if contradictory evidence exists. 20 C.F.R. § 404.1564(b).
 
 
 57
 The ALJ also reasoned that Heldenbrand could not be illiterate because he had been in the Army:
 
 
 58
 [H]e did demolition and explosive work in the Army which seems even less likely since in the 1960's the Army required people to be able to read, especially when they were dealing with explosives. (ALJ Decision, pp. 4-5)
 
 
 59
 Again, there is nothing at all in the record to support this speculative comment by the ALJ.
 
 
 60
 The ALJ also relied on the fact that Heldenbrand's "disability report" shows a box checked, indicating that in previous employment he had done some "writing, complete reports, or perform similar duties." (ALJ Decision p. 5) The record contains a "Disability Report" form, dated April 18, 1992, apparently completed by Heldenbrand's wife[3] or an SSA interviewer. (R. 117) The form asks: "In your [usual] job did you * * * do any writing, complete reports, or perform similar duties?" The box is checked "yes." The form then asks for a description of "the type of writing you did, and the nature of any reports," A handwritten note responds: "He worked on welders, welding bicycle frames, forks, decks, and seats. At the end of a shift he had to fill out a card as to how many pieces he had welded that night." (R. 114) The ALJ could have easily explored whether Heldenbrand merely wrote numbers in certain blank spots on a card, or whether he could actually read the words written on the card. See Eggleston v. Bowen, 851 F.2d 1244, 1248 (10th Cir.1988) (reversing finding of literacy; ALJ cannot rely "solely on an inference derived from [claimant's] previous employment to support his conclusion that [claimant] can read and write," where the inference was rebutted by claimant's direct testimony that he could only write his name, his wife handled the paperwork, and other people did his reading and writing for him in his previous job).
 
 
 61
 We hold that the ALJ could not rationally base a finding that Heldenbrand was not illiterate on the reasoning offered in his decision. See, e.g., Dixon v. Heckler, 811 F.2d 506 (10th Cir.1987); Cunningham v. Heckler, 764 F.2d 91 1 (DC.Cir.1985); Tobias v. Heckler, 605 F.Supp. 233 (N.D.Cal.1985); Holiday v. Schweiker, 563 F.Supp. 1272 (N.D.Ill.1983).
 
 
 62
 The ALJ's report also erroneously states that the VE was told at the hearing that Heldenbrand "had difficulties in reading, writing and performing math problems." (ALJ Decision p. 6) In truth, he was told the opposite:
 
 
 63
 Dr. Dill, I would like you to assume an individual the claimant's age, education, background and experience and I would like you to assume that he is a high school graduate with a presumption of a high school graduate being able to read and write and do simple mathematics. (R.77; emphasis added)
 
 
 64
 Moreover, the ALJ ignored other evidence in the record. For example, Dr. Klinge[4] indicates that the claimant "has significant limitation in reading and writing" (R.304), and that he is "further handicapped by poor reading and writing skills." (R.306) A letter from Anita Race, a rehabilitation counselor for the Illinois Department of Rehabilitation Services, to Heldenbrand's representative, Delores E. Gonzalez, dated November 5, 1993, noted Heldenbrand's "limitations in his ability to read and write," which were severe enough to lead Race to conclude: "Based on the results of Dr. Stevens' testing and my conversation with Mr. Heldenbrand, I do not feel he is a candidate for training at a skilled level. Thus, based on Mr. Heldenbrand's limitations and job availability in this locale, I felt the possibility for employment for Mr. Heldenbrand was very poor and encouraged him to continue the appeal of his Social Security claim." (R. 309)
 
 
 65
 We do not know whether or not Heldenbrand is illiterate. Compare Starks v. Bowen 873 F.2d 187, 189-90 (8th Cir.1989) (upholding a finding of literacy where claimant can "stumble over the words" in a newspaper, and knows "some" but not a "lot" of the words, and had a tested reading score "below a third grade equivalent"); Glenn v. Secretary of Health & Human Services, 814 F.2d 387, 390-91 (7th Cir.1987) (upholding finding of literacy where claimant had completed either the 4th or 6th grade, could write "only the simplest messages" and comprehend "only the simplest written instructions," although he could not read a newspaper or write a letter; concluding that claimant fell into "marginal education" classification), with Eggleston v. Bowen, 851 F.2d 1244, 1248 (10th Cir.1988) (reversing finding of literacy where claimant offered unrebutted testimony that other people had done the reading and writing for him in previous employment); Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir.1987) (claimant is illiterate where she completed six or seven years of formal schooling, but could not read a newspaper, and she and her sister testified that she could not write; there was no indication that she could write even a simple message).
 
 
 66
 Heldenbrand's signature appears to be on various documents in the record. But the ability to sign one's name does not mean the person is literate. 20 C.F.R. § 1564(b)(1); Skinner v. Secretary of Health & Human Services, 902 F.2d 447 (6th Cir.1990) (claimant illiterate although he can sign his own name); Dollar Bowen, 821 F.2d 530, 535 (10th Cir.1987) (claimant who completed 8th grade is illiterate even though he can sign his own name). Many of the disability forms were filled out by either Heldenbrand's wife, or by an SSA interviewer. (R. 108, 113, 115) See Dollar v. Bowen, 821 F.2d at 535 (claimant illiterate, and required help when filling out social security forms). At a minimum, the ALJ was required to further explore the question. See Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir.1996) (remanding for further findings of fact on whether claimant is illiterate)
 
 
 67
 On remand, the question of illiteracy should be fully developed and resolved. We are unsure why Heldenbrand's non-attorney representative before the ALJ, and attorney representative before the district court and this court, chose to not mention this issue. Nevertheless, we believe it should be addressed. See Thompson v. Sullivan, 933 F.2d 581, 587 (7th Cir.1991) ("even though a claimant may fail to raise the issue or present evidence" of a particular impairment, court orders the issue to be developed on remand).
 
 Cognitive Functioning
 
 68
 Even separate from the question whether Heldenbrand was illiterate, we are concerned about the well-documented deficits in his ability to reason, communicate, and function--deficits which would affect findings of credibility, his ability to offer complete and accurate testimony, and his ability to accurately communicate a rather extensive medical history to the myriad of health professionals and rehabilitative personnel he has seen over the years.
 
 
 69
 The ALJ states that he "find[s] that the claimant does not have any limitations associated with a mental impairment." (ALJ Decision, p. 8) It does not appear that Heldenbrand was claiming he had a mental impairment. Nevertheless, his general inability to reason, learn, or remember became decisive when the ALJ based much of his decision on a finding that Heldenbrand was not credible in regard to his claim of illiteracy, his reporting of a cardiac history to various doctors, and his description of the limitation on his ability to perform physical functions such as lifting--all of which were significantly affected by his cognitive abilities.
 
 
 70
 A May 22, 1993 psychological evaluation by Dr. William D. Stevens, a clinical psychologist, shows that Heldenbrand has an IQ of 87 (20th percentile). (R.291-92) The assessment indicates further: "I informally assess he is functioning in the low average range of intelligence." (R213) In addition, he "appeared to have a limited understanding of his [medical] condition." (R.214) The report also refers to Heldenbrand's "deficits in skills." (R.292) Heldenbrand was viewed as having "significant deficits in his general fund of factual information, in his ability to use language effectively, in his ability to mentally compute arithmetic problems, and in his ability to function efficiently psychomotorically." (R.293) In addition, Dr. Klinge wrote on October 18, 1993 that Heldenbrand "has significant limitation in reading and writing." (R.304)
 
 
 71
 As another example of the problems Heldenbrand faced, we note that when asked his address at the hearing before the ALJ, Heldenbrand was unsure of the answer. (R.47-48) And when the SSA reviewer telephoned for information, it was necessary for Heldenbrand to give the telephone to his wife. "[Heldenbrand] answered phone but when I started asking questions he could not remember and had his wife take over for him. No other problems observed." (R. 117.)
 
 
 72
 It seems more than a little unreasonable for the ALJ to accuse Heldenbrand of lying or exaggerating about his medical history when even the professionals who evaluated Heldenbrand found him unable to accurately describe his medical history and conditions. For example, a 1988 "Psychological Assessment of Adjustment to Pain" prepared by Dr. Jeffrey Gfeller states: "I note the patient appeared to have a limited understanding of his condition and had some difficulty recounting his prior treatment with much detail" (R. 214) Similarly, Dr. Naam wrote in September 1990 that Heldenbrand was "generally a poor historian." (R.277)
 
 
 73
 On remand, the Secretary, should take into consideration any evidence of limitations in cognitive functioning, and discuss their import to the relevant issues, particularly credibility.
 
 Loss of Hearing
 
 74
 Although the ALJ ultimately found that Heldenbrand had a "significant bilateral hearing loss" (ALJ Decision, p. 5), he also found the claim of hearing problems generally undermined Heldenbrand's credibility. The ALJ wrote: "At times, without any variation of pitch or tone in the question posed, he claimed to have difficulty hearing." (ALJ Decision, p. 4)
 
 
 75
 There is no question that the hearing loss is significant. A 1985 report by Dr. Michael Novak indicated that Heldenbrand had "profound" hearing loss in the left ear, and a "severe to profound hearing loss in the right ear." (R. 184) A December 1986 letter from Dr. Bernard C. Adler indicates that Heldenbrand's hearing loss was permanent and that, "[a]ccording to the Illinois Workers Compensation Act, the disability rating would be 100%." (R. 186)
 
 
 76
 At times, Heldenbrand had trouble hearing For example, a psychological consultation dated November 20, 1992, written by Dr. Stevens (the clinical psychologist) indicates that Heldenbrand wore a hearing aid in his right ear only, because doctors advised "him that an aid in his left ear would be ineffective." (R.279) Dr. Stevens noted on both his November 1992 and May 1993 reports that Heldenbrand had difficulty hearing him. (R.291, 279)
 
 
 77
 Thus, we find the ALJ's remark that Heldenbrand merely "claimed to have difficulty hearing" to be unfounded, particularly in view of the ALJ's own finding that Heldenbrand suffered from a significant bilateral hearing loss. See Peterson v. Chater, 96 F.3d 1015, 1016 (7th Cir.1996) (ALJ's "two findings are irreconcilable, requiring a remand to the agency for new findings").
 
 Pain Medication
 
 78
 At the hearing, the ALJ only briefly questioned Heldenbrand about his medications, but did not inquire about whether he had ever used prescription medicine for pain, or the effect of such medications.
 
 
 79
 ALJ Mr. Heldenbrand, as I understand it, the only medications you're talking [sic] at this time are Advil?
 
 
 80
 A Yes.
 
 
 81
 Q You take Procardia[5] once a day, is that correct?
 
 
 82
 A Yeah, I guess that's what it--I take some medicine, I don't know what it is. (R.58)
 
 
 83
 Given Heldenbrand's obvious confusion, the ALJ was wrong to not explore the question more thoroughly, particularly since he later chose to conclude that Heldenbrand's pain was only mild to moderate because he was not taking strong pain medications:
 
 
 84
 The claimant takes no medication for severe or intractable pain. Indeed, he admitted that he takes no pain medication of any kind beyond over-the-counter analgesics. His only other medication is Procardia for his history of hypertension (which is satisfactorily controlled). If the claimant was so severely limited that he was unable to perform the relatively mild exertional demands of light work he would have surely have [sic] been prescribed more potent medications. (ALJ Decision, p. 6)
 
 
 85
 Whether a claimant takes prescription medication for pain can be relevant to the question of what degree of pain he experiences. Factors to be considered in regard to pain include dosage and effectiveness of pain medications, and other treatment for the relief of pain. Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.1994). The pills one consumes rarely tell the whole story.
 
 
 86
 In this case, the medical record strongly contradicts the ALJ's finding that if Heldenbrand was really in severe pain he would be taking stronger medications. Cf Herron v. Shalala, 19 F.3d 329, 336 (7th Cir.1994) ("we do not find that the taking of medication as Herron needs it is necessarily inconsistent with his claim of chronic pain"); DeFrancesco v. Bowen, 867 F.2d 1040, 1044 (7th Cir.1989) (discussing the legal consequence of a claimant who has "merely been remiss in dealing with his diseases," and finding that "[l]ack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits").
 
 
 87
 Heldenbrand tried various medications over the years. For example, a 1988 doctor's notes indicate that Percodan was prescribed for right wrist pain. (R. 197) This type of strong pain medication was not helpful Dr. Gfeller wrote in an August 1988 psychological assessment: "[T]he patient reports experiencing little benefit from the narcotic analgesic, [and so] consideration should be given to eliminating this medication from his regimen." (R.214) Heldenbrand also reported to Dr. Gfeller that he had been taking Tylenol # 3, but that "the medication has become increasingly less effective over time." (R.212)
 
 
 88
 A medical report by Dr. Bruce A. Massau states that Heldenbrand "gives a history of hypersensitivity to drugs, including Valium." Heldenbrand reacted to the medication with subconjunctival hemorrhage of the right eye, nausea, vomiting.
 
 
 89
 Moreover, Heldenbrand tried a wide variety of alternate means to achieve relief from pain. In 1988, Heldenbrand was evaluated and treated at a Pain Management Program in St. Louis, Missouri. (R.21 1) A 1988 medical notation indicates Heldenbrand was using a TENS unit and physical therapy to "damp[ ] out some of his discomfort" (R. 197) Dr. Gfeller wrote that Heldenbrand was "using many strategies which are consistent with the management of an intractable pain condition." (R.214) Several of the pain management techniques were "effective." (R.214) Dr. Gfeller recommended that Heldenbrand not rely on narcotic pain relief Instead, he "should continue to use modality treatments such as application of ice and massage for palliative relief If possible, these modalities should be incorporated into his work schedule to provide some relief throughout his work day." (R.215)
 
 
 90
 The medical records clearly document that Heldenbrand's pain, particularly in his right' wrist, persisted over many years and through five (apparently unsuccessful) surgeries. And Heldenbrand's testimony before the ALJ supported the medical findings. For example, he testified that he woke up 15 or 20 times a night because "I'm having quite a bit of pain in my arms and, and my right arm's (inaudible) and sometimes my left arm--I'm getting so I can't sleep." (R.69-70) We conclude that it was unreasonable and contrary to the medical record for the ALJ to find that the absence of strong pain medication meant Heldenbrand's pain level was only mild to moderate, particularly where not, a single doctor suggested Heldenbrand was exaggerating his experience of pain.
 
 
 91
 Also, the ALJ told the VE to assume that Heldenbrand suffered mild to moderate pain. (R.79) The VE testified that the pain would have to be "distracting" and "moderately severe or above" before it became relevant to employability. (R.79-80) On remand, the VE should be given accurate information about the level of pain documented in the medical records, and the ALJ should further explore the medication issue.
 
 Household Chores
 
 92
 The ALJ also found Heldenbrand not credible because of his description of household chores he might be capable of performing.
 
 
 93
 The claimant's daily activities are not significantly impacted by his condition currently as he is able to perform household chores including washing dishes which one can hardly do with a truly useless extremity. He is also able to cook, do laundry, and go shopping. It has been already noted that he drove himself to the hearing and drives several times per week. The claimant said that he could not perform vacuuming or mopping or sweeping because of his hand problems, but it is extremely difficult for me to conceive how an individual could wash dishes with a totally disabling wrist or hand problem and yet could not operate a vacuum cleaner, which can be done with one hand! (ALJ Decision, p. 7, emphasis in original.)
 
 
 94
 The ALJ mischaracterizes Heldenbrand's testimony.[6] Heldenbrand did not testify that "he could not perform vacuuming"; he testified that he could vacuum "a little bit" with his left hand. (R. 64) As for cooking, he could "[l]ook a little but not too much." R.64) He could wash dishes "a little bit." R.64) And driving obviously can be done with one hand. Cf DeFrancesco, 867 F.2d at 1044 ("Many people drive cars who shouldn't and [claimant] may be one of them. "). Also, doing "a little bit" of any chore differs considerably from performing an equally arduous task for eight hours in a work day.
 
 
 95
 This line of questioning again depicts the type of adversarial cross-examination, challenging Heldenbrand on every statement, that is improper in a hearing before an ALJ in a Social Security proceeding. In any event, we find that the testimony does not support the ALJs conclusion that Heldenbrand's impairments do not significantly affect his daily activities.
 
 Left Hand
 
 96
 There is a great deal of uncertainty in the record about the extent to which Heldenbrand could use his left hand. It Is obvious that a finding that Heldenbrand is unable to fully use that hand would have had a significant impact on the determination that he could perform light work, which generally requires the use of arms and hands (at least one!) to grasp, hold and turn objects. SSR 83-10
 
 
 97
 According to a form completed by Heldenbrand's wife, he was missing the first joint of his forefinger on the left hand. In addition, the little finger on the left hand had been amputated and reattached. (R. 115) It is not clear whether the two fingers have any feeling remaining, or prevent him from performing tasks requiring manipulative dexterity.
 
 
 98
 There is some evidence that Heldenbrand suffered pain in the left hand and arm. He testified: "Yes, I have it [pain] in my right and left arms It--the right it's got quite a bit of pain. (R.68) He sometimes drops things held in his left hand. (R.70) Physical therapy reports dated May and June 1988 mention the left hand and wrist several times. (R.208-09) Although it is difficult for us to decipher the handwritten comments, it does appear that some therapy was performed on the left upper extremity. In addition, the psychologist's report refers to "injuries to both upper extremities." (R.296) Also, Dr. Naam noted on November 1, 1993, that Heldenbrand complained of pain in his left hand (R.310) Anita Race, the rehabilitation counselor, wrote on November 5, 1993, that Heldenbrand had a "history of injuries to both upper extremities." (R.309; emphasis added.)
 
 
 99
 But there was also evidence that the left hand did not impair Heldenbrand's ability to function. According to Randy Boes, an adjudicator for the Illinois Department of Rehabilitation Services, Dr. Naam reported on June 23, 1992 that Heldenbrand's "left hand is normal." (R. 268) Similarly, on August 12, 1992, Dr. Naam wrote in a letter to Randy Boes: "His left hand is completely normal and is not limited at all." (R.269) Dr. Naam added: "I would recommend that the patient work in a one handed job at the present time using only the left upper extremity." (R. 269) In October 1993, Dr. Klinge wrote: "He has no significant problem at this time in the left upper extremity." (R. 305) A psychological assessment states there was an amputation of part of the left index finger but "no ongoing discomfort." (R.213) To add to the confusion, sometimes the grip strength of the right and left hands differed considerably (R.226, 254, 264, 265), but at least once--as the ALJ noted--the grip strength in both hands was the same. (ALJ Decision, p. 3)
 
 
 100
 The importance of the left hand's ability to function is obvious. The VE formed his opinion that Heldenbrand could perform light work on the basis that the claimant would "mostly" or "primarily" use his left hand. Any potential job, then, would be "restricting him mostly to using the left hand with the right hand being somewhat supportive." (R.81)
 
 
 101
 VE: Well, I think it should be in a situation where he could use--utilize his left hand mostly and that's what I was considering in the hypothetical one is that he primarily would be using his left hand. If there--I wouldn't restrict him from any of those in terms of being dangerous but virtually would say that he'd have to be able to do most of those kinds of things with his left hand. In terms of numbers there's virtually hundreds of thousands of those jobs. And the ten thousand is restricting him mostly to using the left hand with the right hand being somewhat supportive. (R.81)
 
 
 102
 The VE testified further that he did not take into consideration whether the hypothetical claimant had any remaining dexterity function in his hands:
 
 
 103
 VE: * * * I don't think he could perform things and as I understood the hypothetical why he can only lift up to ten pounds There wasn't anything about bi-manual dexterity but I certainly took into consideration as the hypothetical implies that his fight hand would be more of a supporting function than a gripping, grasping, feeling, handling function. (R. 81)
 
 
 104
 We are concerned about the manner in which the ALJ resolved the conflict in the medical records. He chose to simply guess whether the left hand was impaired. The ALJ remarked, "[I]t has occurred to me that [Dr. Naam] is referring only to the claimant's right upper extremity ..."[7] (ALJ Decision, p. 7; emphasis in original). Thus, whether the left hand is impaired should be clarified on remand. If Dr. Naam is correct in considering Heldenbrand a "one armed individual" because the fight hand is useless, whether Heldenbrand can use his left hand fully could be crucial. As we will see, the difference between "somewhat supportive" and "useless" can be decisive. The issue must be clarified on remand. Cf Jones v. Shalala, 10 F.3d 522, 525-26 (7th Cir.1993) ("Claimants with the use of only one arm are not automatically entitled to disability benefits.").
 
 Lifting Restrictions
 
 105
 The ALJ concluded in his decision that Heldenbrand could lift 10 pounds with the right hand, and 20 to 25 pounds with the left hand. "Specifically, I find the claimant can lift 10 pounds with his right hand and 20 to 25 pounds with his left hand...." (ALJ Decision p. 5[8])
 
 
 106
 The significance of the finding is that Heldenbrand could then perform light jobs, and was not restricted to sedentary jobs. Light work requires lifting 20 pounds at a time, with frequent lifting or carrying of 10-pound objects. Sedentary work requires lifting only 10 pounds at a time, and occasionally lifting or carrying articles such as docket files, ledgers, and small tools. 20 C.F.R. § 404.1567.
 
 
 107
 The ALJ based his finding on Heldenbrand's testimony, and then speculated about the opinion of] )r. Naam that Heldenbrand was limited to lifting 10 pounds occasionally or 5 pounds frequently.[9] Heldenbrand testified:
 
 
 108
 ALJ: How much can you lift?
 
 
 109
 A Probably ten pounds.
 
 
 110
 Q Well, you can lift more than 10 pounds with your left hand, can't you?
 
 
 111
 A I, I can lift a little more than 10 pounds with my left hand.
 
 
 112
 Q How much can you lift with your left hand?
 
 
 113
 A I'd say probably ess than about 25 pounds.
 
 
 114
 Q Ten pounds with your right hand?
 
 
 115
 A Ten pounds? Yes, ten pounds.
 
 
 116
 Q Can you carry those weights for a short distance?
 
 A No. that, that just done me in. I can't
 
 117
 Q Well, you can carry a gallon of milk for example, from your car to the house, can't you?
 
 
 118
 A Yes, I can carry that but it bothers me.
 
 Q That's about 10 pounds[10]
 
 119
 A What?
 
 
 120
 Q It's 8.8--a gallon of milk weighs 8.8 pounds.
 
 
 121
 A Uh-huh.
 
 
 122
 Q You can carry that from the car to your house--
 
 
 123
 A Yes, but it, it, it bothers me.
 
 
 124
 Q Can you carry a twenty-four pack of sodas with your left hand, can't you?
 
 
 125
 A Yeah, I can carry it in there--yeah, I can carry that in my left hand, yeah.
 
 
 126
 Q That's about 18 or 19 pounds.
 
 
 127
 A You got me confused. I don't understand what you're talking about.
 
 
 128
 Q You can carry a twenty-four pack of sodas from your car to your house, can't you?
 
 
 129
 A Yes, I can carry that.
 
 
 130
 Q Can you do that with your right hand?
 
 
 131
 A No, I'd drop it--
 
 
 132
 Q You can do it with your left hand? A--I can't, you know, it just slides out of my hand, ain't nothing.
 
 
 133
 Q Can you do it with your left hand?
 
 
 134
 A I can do it with my left hand, yes, sir." (R 61-62)
 
 
 135
 We think this testimony demonstrates that Heldenbrand was profoundly confused, understandably baffled by the ALJ's questioning, leading him to give a spectrum of potentially conflicting statements within a matter of a few minutes, ("I can carry that but it bothers me"; "You got me confused"; "I don't understand what you're talking about"; "No, I'd drop it"; "just slides out of my hand"; "I can do it").[11] This again points to a type of adversarial cross-examination which an ALJ should not be imposing on a litigant in a Social Security proceeding.
 
 
 136
 In regard to lifting, the ALJ simply guessed about Dr. Naam's restrictions. Although the ALJ found that Dr. Naam's assessment was "entitled to compelling and conclusive weight" (ALJ Decision p. 6), the ALJ then contradicted himself by refusing--without explanation--to rely on some of Dr. Naam's restrictions[12] As discussed above, what especially concerns us is the ALJ's comment that "it has occurred to me that [Dr. Naam] is referring only to the claimant's right upper extremity ..." (ALJ Decision, p 7;. emphasis in original.)
 
 
 137
 The lifting restrictions cannot be evaluated with any certainty until the left-hand / right-hand distinction is clarified. Consequently, we think the matter should be resolved on remand, and not based on this type of speculative reasoning. We agree with the magistrate judge that Heldenbrand's "equivocal description of his lifting abilities is not evidence that a reasonable mind might accept as adequate to support the ALJ's conclusion." See Orlando v. Heckler, 776 F.2d 209, 213 (7th Cir.1985).
 
 
 138
 In addition, as mentioned earlier, it is not at all clear that using the right hand in a "supportive" function is consistent with the medical reports finding that the right hand is "useless. On June 23, 1992, Dr. Naam wrote: "His problem is that he has a nerve that has been buried in the bone and his hand has extreme discomfort to the point where he can't even do anything with his hand, not even simple tasks. His right hand as it stands is unusable.... As it stands, I would view him as a one armed individual." (R. 472) On remand, both the hypothetical question and the answer must be far less vague. See Greene v. Sullivan, 923 F.2d 99, 101 (8th Cir.1991) (the VE interpreted "loss of use" of left hand as "some loss" rather than "complete loss" and therefore the "hypothetical question was not specific enough to engender reliable information, and therefore the answer to it does not constitute substantial evidence").
 
 Looking for Work
 
 139
 The ALJ also found Heldenbrand not credible because he was both claiming total disability and looking for a job.
 
 
 140
 The claimant, moreover, has actively sought employment according to two reports from Dr. Stevens, a consultative psychologist, and Dr Naam. If he were truly incapable of performing any substantial gainful activity this would, it appears, be a meaningless gesture. He obviously believes himself capable of some work activity. (ALJ Decision, p. 7)
 
 
 141
 The record shows that Heldenbrand wished to return to some form of work. For example, Dr. Gfeller wrote in an August 1988 psychological assessment that despite Heldenbrand's "increased discomfort from work, he clearly expressed a desire to continue with his present occupation, rather than consider an occupational change." (R.214) Interestingly, medical professionals encouraged Heldenbrand to not push himself so hard. Notes by an occupational therapist in Terre Haute, Indiana, dated March 22, 1991, state that Heldenbrand was overly motivated. "We've attempted to have him cut back intensity of home program, but he appears overly motivated and I believe he pushes himself too hard. We're cut[ting] back intensity of his program here." (R.255)
 
 
 142
 At the hearing, the ALJ questioned Heldenbrand about whether his search for a job meant that he thought he was capable of working:
 
 
 143
 ALJ Now Mr. Heldenbrand, I also understand you've been looking for work, is that fight?
 
 
 144
 A Yes, sir.
 
 
 145
 Q When did you last look for work?
 
 
 146
 A Here, couple weeks ago. They called me for an interview and they wouldn't accept me.
 
 
 147
 Q So you think you can work?
 
 
 148
 A Well, I have to because I ain't go no money coming in. I have to do something.
 
 
 149
 Q All right.
 
 
 150
 ALJ Anything else?
 
 A I can try at least, can't I? (R. 72)[13]
 
 151
 The ALJ later questioned the VE on whether a person who is looking for work can also claim to be disabled
 
 
 152
 ALJ [I]f I find the testimony given here today to be credible, do you believe the claimant is employable? If so, why, if not, why not, or if there's a conflict in the testimony, please identify that conflict.
 
 
 153
 VE Well, I think the conflict is on the one hand why he said he couldn't--he wanted to work and indicated he wanted to go out and apply for things but on the basis of limitations that he perceived them why I don't believe there would be anything he could perform. (R.80)
 
 
 154
 We think that the ALJ's reasoning is faulty. There is no evidence that Heldenbrand was successful in seeking a job.[14] See Bartell v. Cohen, 445 F.2d 80, 82 (7th Cir.1971) (plaintiffs attempts to find a job were "relevant only to her motivation and not to whether she was, in fact, disabled"; to reason otherwise would mean that a claimant could "disclose the insubstantial nature of his disability by either seeking employment, or not seeking it"). A claimant might seek a job in ignorance of the nature of his conditions, only to find later, after being hired, that his attempt to work is unsuccessful due to his disabilities; or he might work only an hour or two a day; or receive gratuitous or charitable employment.
 
 
 155
 In any event, we think that under the facts presented here, and given the extensive medical history of severe impairments, it was unreasonable for the ALJ to not only characterize Heldenbrand's wish to work in some capacity as a "meaningless gesture," but also to consider it proof that he was not disabled.
 
 Chest Pain / Heart Condition
 
 156
 Although the ALJ concedes that Heldenbrand was diagnosed with costochronditis, he completely ignores the chest pain Heldenbrand consistently complained of to physicians for many years, and instead focuses on Heldenbrand's belief that the chest pain was caused by a heart condition. (ALJ Decision, p. 4) Yet it is not clear to us whether Heldenbrand is claiming that his exertional impairments (or combination of impairments) include chest pain. He testified at the hearing:
 
 
 157
 Q Have you seen a doctor for your chest pains recently?
 
 A No, I ain't got the money.[15]
 
 158
 Q Well, when's the last time you saw someone for your chest pains?
 
 
 159
 A It was about probably two or three year[s] ago. (R.58)
 
 
 160
 The non-attorney representing Heldenbrand also questioned him about chest pain.
 
 
 161
 REP: Okay. Now do you continue to have chest pain?
 
 
 162
 A Yes. I can--I usually have chest pains about every day, just try, try to ignore them. (R.68)
 
 
 163
 At that point, however, the ALJ stopped the representative from inquiring further about chest pain.
 
 
 164
 ALJ Ms. Gonzalez, you're going to have some evidence with regard to chest pains. The Seventh Circuit is very clear
 
 RE? Oh, no, I'm just
 
 165
 ALJ Because the evidence in the record indicates that the nitroglycerin tablets were not working for the chest pain back in 1984 which is a very strong indication that it's not cardiac in origin, that it's chest wall pain because nitroglycerin generally does relieve pain. Now if and I'm not sure--I'm sure I probably have mentioned the decision in Edwards v. Sullivan[16] to you as far as requirement of some objective evidence.
 
 
 166
 REP There isn't any. I mean, there isn't any for nine years.[17]
 
 
 167
 ALJ right, then let's move along if we're not claiming that." (R.69)
 
 
 168
 We are not sure why the representative backed away, when challenged by the ALJ, from relying on the medical reports (and her client's own testimony) of chest pain. Perhaps Heldenbrand has chosen not to argue that the chest pain is one component of his disability. Regardless, whether or not the chest pain is being relied on as a basis for disability, we are deeply concerned about how the ALJ used the complaints of chest pain and possible cardiac problems as another string in his bow to find Heldenbrand not credible. The ALJ found that "[t]here is a strong element of exaggeration on the part of the claimant in relating a non-existent cardiovascular history to [Dr.] Klinge." (ALJ Decision, p. 4)
 
 
 169
 It is true that Heldenbrand consistently reported to medical personnel that he had a history of heart problems. For example, at a hearing clinic, on July 5, 1984, Heldenbrand reported that he was taking medication for a heart condition. (R. 183), Dr Klinge indicated on October 18, 1993 that Heldenbrand was restricted from "walking, due to chest pain." (R.301) He was also restricted from "physical exertion due to anterior chest pain suggestive of angina." (R.301) Dr. Klinge also wrote about a medical history that Heldenbrand certainly did not invent or recite orally to the doctor: "Of much greater significance is the fact that in 1984 at the Springfield, Illinois Medical School facility he apparently had an Angioplasty of his coronary arteries following an MI. This was followed by a second MI several months later thought to be due to an embolus. Since that time he's been aware of an anterior, central chest tightness which comes on if he exerts himself to any significant degree vigorously" (R 304) "He's had no subsequent cardiac follow up, and he is on no cardiac medications. For a year or so after his treatment at Springfield Medical School, he apparently wore a Nitro-Patch when the sublingual Nitroglycerin tablets failed to have an effect." (R. 304) Dr. Klinge also wrote: "This patient's chest discomfort is described as a central, anterior chest tightness with some associated shortness of breath coming on with extended physical activity and lasting for 15--20 minutes before it finally subsides." (R.306) His "chest pain. is very suggestive of angina with a history dating back to previous coronary artery disease about 5 years ago." (R. 306)
 
 
 170
 A "Psychological Assessment of Adjustment to Pain" was prepared (dated August 22, 1988) by Dr. Jeffrey Gfeller. "The patient has a history of heart problems. Apparently, he underwent heart catheterization several years ago due to coronary blockage. He also reported experiencing angina several years ago and took medication for his condition. However, he indicated that he is asymptomatic at the present time." (R.213) In addition, Anita Race, a rehabilitation counselor, stated in her November 5, 1993 letter that Heldenbrand had a history of "chest pain with history of coronary artery disease" (R. 309)
 
 
 171
 A hospital discharge report dated March 23, 1994. stating that plaintiff had been admitted to the intensive care unit with chest pain and shortness of breath, and had a final diagnosis of Angina, with a secondary diagnosis or bradycardia He was given nitroglycerin, Motrin, and Procardia. A consulting physician's report dated March 22, 1984, signed by Dr. Michael Murray, indicated that the tests revealed a "falsely elevated CPK-CK," but that he did not have heart disease and instead had parasternal costochronditis. (R. 166) Notwithstanding Dr. Murray's opinion, Heldenbrand was discharged from the intensive care unit only after he was instructed to take nitroglycerin, and Procardia.
 
 
 172
 Heldenbrand's wife also believed that her husband had a history of cardiac disease. She wrote on a March 10, 1992 health form that he had a heart problem in 1984 (R. 115). "In 1984 he had a balloon test done in Springfield, Illinois for his heart. A condition which had bothered him since he had been in the service. In 1964 he had spent 6 mos in Walter Reed Hospital for a valve closing off to his heart." (R. 115) Heldenbrand also testified that at one point he had restrictions on his driver's license because he was taking medicine for his heart. (R. 63)
 
 
 173
 The ALJ himself pointed out during the hearing that Heldenbrand was taking heart medication Procardia, which kept his hypertension under control.
 
 
 174
 Although Heldenbrand was finally diagnosed with parasternal costochronditis (R. 166) (chest wall pain), and not cardiac disease, we find that it would be perfectly reasonable for Heldenbrand to surmise that he had a history of heart problems. See Sarchet, 78 F.3d at 308 (claimant could easily "surmise that what happened on the treadmill was another heart attack," where she had previously been told that she might have suffered a "small MI" [myocardial infarction], and on the treadmill she had experienced rapid heartbeat "which an unsophisticated person might think a form of heart attack" where she then underwent a catheterization and was administered nitroglycerin, and therefore ALJ erred in finding that claimant's reporting a heart attack as part of her history "showed her propensity to exaggerate her condition").
 
 
 175
 Thus, contrary to the ALJ's finding, we think that, given Heldenbrand's medical history and his serious difficulties in understanding that history, it was reasonable for Heldenbrand to report to medical personnel that he believed he had a history of heart problems. The ALJ's "exaggeration" finding is not supported by the record
 
 Standing/Sitting
 
 176
 The ALJ found that Heldenbrand could stand or sit for eight hours a day. The import of the finding stems from the fact that the category of "light" work requires that the worker be able to walk or stand for substantial periods of time with some pushing and pulling of arm or leg controls. In contrast, a worker limited to sedentary jobs need only walk or stand occasionally. 20 C.F.R. § 416.967. Heldenbrand testified at the hearing that he could stand for 10 or 15 minutes:
 
 
 177
 ALJ: How long can you stand, sir?
 
 
 178
 A Probably ten, fifteen minutes, then I rest.
 
 
 179
 Q Well now, sir, how long can you stand if you need to?
 
 
 180
 A Need to?
 
 
 181
 Q Can you stand for at least two hours at a time?
 
 
 182
 A No, not two hours, definitely not two hours, no.
 
 
 183
 Q Why not?
 
 
 184
 A Because it bothers me.
 
 
 185
 Q Well, how does it bother you?
 
 
 186
 A In my back, bothers me quite a bit.
 
 
 187
 * * *
 
 
 188
 Q How long can, how long can you stand if you need to, sir?
 
 
 189
 A If I need to I imagine probably a half hour, maybe about 35, 40 minutes, I'll sit down and usually rest. (R.59-60)
 
 
 190
 The ALJ inquired further about Heldenbrand's ability to sit for extended periods of time:
 
 
 191
 ALJ How long can you sit?
 
 
 192
 A Not too Icing. It's bothering me now.
 
 
 193
 Q Well, how long can you sit if you need to? 'Not too long" means different things to different people.
 
 
 194
 A Well, I'd say about probably 30, 40 minutes, it's bothering me. (R.61)
 
 
 195
 Dr Naam indicated in a disability assessment form dated November 22, 1993 that Heldenbraad was not restricted from standing or walking. He could stand or walk eight hours a day without interruption. (R.315) Sitting was not affected. (R316) In contrast, Dr. Klinge wrote in October 1993 that Heldenbrand "can be on his feet for a good 45 minutes to an hour without significant problems, and sitting likewise can be accomplished for an hour without significant problems." (R. 305) The ALJ stated at the hearing that he was "very strongly discounting Dr. Klinge's report as being virtually worthless because he's not a treating physician," and he saw claimant only once. In addition, the ALJ believed that Dr. Klinge had no medical records to review, although the representative immediately replied that she had sent all medical records to Dr. Klinge. (R.83) Instead, the ALJ relied on Dr. Naam's report in providing the facts for the VE's hypothetical.
 
 
 196
 The hypothetical given to the VE indicated that the claimant could sit for an hour at a time, stand for an hour at a time, and maintain either position for a total of six to eight hours in a day. The individual could also walk at least half a mile. (R. 76-77) The ALJ also informed the VE to consider that the claimant could "just get up, change, move around a bit and then sit for another hour." (R.77) He could "stand, take a brief break and then stand again, take a postural limitation that would be able to either sit or stand" (R.77) He wouldn't have to necessarily sit down except "for a very brief time period." (R.77) But he could "either sit or stand for a total of six to eight hours in either positions" (.78) The hypothetical situation is more than a little confusing. Could the hypothetical claimant stand or sit without restriction, or did he need to alternate standing and sitting on a frequent basis so that he did neither for more than "a very brief time period"? See SSR 96-9p (some individuals are required to alternate sitting and standing, and where the "need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded").
 
 
 197
 We think that on remand the Secretary may wish to more carefully examine this disputed question of Heldenbrand's ability to stand, sit, and walk. Cf. DeFrancesco, 867 F.2d at 104445 (noting that doctor "was answering a theoretical question about [claimant's] physical capacity rather than a practical question about his ability to do a job that requires walking or standing for six hours a day, every day"). The restrictions, if any, should be considered in conjunction with other impairments that may not in themselves disable Heldenbrand from performing a certain level of work. See 20 C.F.R. §§ 404.1523, 416.9231 20 C.F.R. Part 404, Subpart P, App. 2, Ex. I; Peterson v. Chater, 96 F.3d 101 5, 1017 (7th Cir.1996) (ALJ must consider all impairments together; claimant missing tip of one finger, has carpal tunnel syndrome, and needs to alternate sitting and standing); Johnson v. Sullivan, 922 F 2d 346, 350-52 (7th Cir.1990) (en banc).
 
 Hypothetical Question: Repetitive Motion
 
 198
 The ALJ completely omitted, in his own findings and in the hypothetical offered to the VE, the restriction against repetitive movement. Dr. Naam filled out a disability assessment form, dated November 22, 1993, indicating that there should be no repetitive movement of the right wrist. (R.3 17) Dr. Timothy J. Friedlein, an orthopedic surgeon, wrote in a report dated December 6, 1988, that Heldenbrand should not "continue to be working at those jobs requiring repetitive hand motions such as hammering or repetitive jerking motions." (R.224) Dr. Timothy S. Loth, also an orthopedic surgeon, wrote on March 10, 1989, that "Mr. Heldenbrand would benefit from some job modification, limiting all repetitive hand and wrist motion type activities, such as hammering, and repetitive jerking motions." (R.226) On remand, the Secretary must include this restriction in any hypothetical question given to a VE, and in its decision making process.
 
 Hypothetical Question: Frequent Breaks
 
 199
 The VE testified that if the claimant needed frequent breaks, there would be no job that he could perform.
 
 
 200
 REP: If the man wasn't able to stay on task, if he needed to take frequent breaks as he said that he does every day, would he be able to be employable?
 
 VE No, nothing he could perform. (R.82)
 
 201
 Yet the need for frequent breaks was not included in the hypothetical presented to the VE, or considered by the AL. The medical records point to a need for frequent breaks. The November 22, 1993 disability assessment form completed by Dr. Naam indicated that Heldenbrand "require[s] frequent rest periods during the day for relief of pain secondary to the impairment" (R. 317) Dr. Klinge indicated in his October 18, 1993 report that Heldenbrand required "frequent rest periods during the day for relief of pain secondary to the impairment." (R.303) A letter from the representative dated June I, 1994, also indicates that Heldenbrand needed frequent rest from pain. (R.318) Given the VE's testimony that frequent rests for pain meant no job was available to Heldenbrand, and given our criticism of the ALJs findings regarding pain, we think the question of frequent rest should be also resolved on remand.
 
 Vocational Expert
 
 202
 As we have discussed, the VE was not given full and accurate information. The facts as presented fail to meet our requirements set forth in Ragsdale v. Shalala 53 F.3d 816, 820 (7th Cir.1995) (hypothetical question is not necessarily faulty if it does not include each of claimant's impairments, as long as the VE has reviewed the record completely), and Ehrhart v. Secreatry of Health and Human Services, 969 F.2d 534, 540 (7th Cir.1992) (same), because the VE could not possibly have reviewed all of the medical or disability-related documents, since many of them were apparently not submitted to the ALJ until after the hearing. (R.5) Indeed, it appears from the list of exhibits that nothing from Dr. Naam was submitted as an exhibit until after the hearing, in which case the VE presumably never saw Dr, Naam's complete (if any) records. (R.5)
 
 
 203
 Also, at the hearing the VE explored the facts in only the most superficial manner. He listened to the very brief testimony of Heldenbrand, then asked him a total of three questions, all concerning the amount of weight he used to be able to lift on his previous job as a machine operator. (R.73-75) There were no question posed regarding Heldenbrand's current limitations.
 
 
 204
 We think the VE should be given all the relevant information, and be given an accurate hypothetical question, before offering an opinion as to Heldenbrand's ability to work. See Herron v. Shalala, 19 F.3d 329, 337 (7th Cir.1994) ("The hypothetical question posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record"); Cass v. Shalala, 8 F.3d 552, 556 (7th Cir.1993) (same); Ehrhart, 969 F.2d at 540 (same)
 
 Light/Sedentary Work
 
 205
 The ALJ concluded that Heldenbrand was "able to perform a limited a[sic] range of light work." (ALJ Decision, p. 5) On remand, the Secretary must determine, then, whether Heldenbrand is truly capable of light work. We note that Anita Race, the rehabilitation counsel for the Illinois Department of Rehabilitation Services, found that Heldenbrand would not even be capable of sedentary work. (.309) In addition, the VE testified that Heldenbrand had no transferrable skills. (R.76)
 
 
 206
 Given Heldenbrand's problems with cognitive functioning, his rather barren education, his age, and his work history, if Heldenbrand was limited during the relevant period to unskilled sedentary positions, the Secretary must take into account the fact that "most unskilled sedentary jobs require good use of both hands." Soc. Sec. Ruling 83-10.
 
 Date of Onset
 
 207
 We also express concern regarding the ALJ's choice of the onset date. The ALJ chose the date of the decision, January 10, 1994, as the time when "the claimant was nearly 'of advanced age' and applying the age categories non-mechanically, ... found [him] disabled under Medical-Vocational Rules 202.01--202.02." (ALJ Decision, p. 9, finding no. 10.) Choosing the date of the decision appears to us to be arbitrary, since Heldenbrand's physical condition was basically the same since his alleged onset date of August 1990.
 
 Conclusion
 
 208
 Given the substantial factual errors and omissions made by the ALJ, we must reverse. Heldenbrand argues that there is no need for a remand. However, since "[t]he case could easily have gone the other way," and thus we cannot find that "no reasonable trier of fact could have come to a different conclusion," we believe remand is appropriate here. Sarchet, 78 F.3d at 308-09 ("When the decision ... is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless.").
 
 
 209
 We do not have the general power to order that on remand the case be assigned to a different ALJ. See Sarchet, 78 F.3d at 309; Travis v. Sullivan 985 F.2d 919, 923-24 (7th Cir.1993). Nevertheless, we do recommend that the Secretary assign the case to a different ALJ. See Sarchet, 78 F.3d at 309.
 
 
 210
 The judgment of the district court is REVERSED and the case is REMANDED to the agency for further proceedings.
 
 
 
 [1]
 Heldenbrand was 51 years old as of the date of alleged onset of disability, August 10, 1990. His date of birth is July 29, 1939
 
 
 [2]
 And a 1992 National Adult Literacy Survey conducted by the National Center for Education Statistics concludes that 16 to 20% of all adults with high school diplomas perform in the lowest literacy level on the relevant scale
 
 
 [3]
 For example, on page 4, a handwritten portion states: "make his meals while I am away at work." (R. 113)
 
 
 [4]
 Dr. Klinge is a physiatrist (a specialist in physical medicine and rehabilitation)
 
 
 [5]
 Procardia is generally used to treat angina
 
 
 [6]
 The relevant portion of the testimony reads as follows:
 ALJ: Well, if you need to you can cook though?
 A Cook a little but not too much.
 Q Can you wash dishes?
 A I can wash dishes a little bit, yes.
 Q Can you sweep and mop and vacuum?
 A No.
 Q Why not?
 A The vacuum cleaner bothers me, my right hand.
 Q Can you use your left hand?
 A I use it say if I like vacuum a little bit with the left hand, yes sir.
 Q Can you wash clothes?
 A I don't wash clothes.
 Q That's not what I asked you. Could you wash clothes?
 A No, I don't think I could.
 Q Why not? Why not?
 A Because I can't read the inscriptions on the soap.
 Q Well, physically you could--
 A You might think I'm silly on that but I can't.
 Q Physically you could wash clothes, couldn't you? AS far as the physical demands?
 A I--probably I could throw them in the washer, yes. (R. 64)
 
 
 [7]
 Although the district court did not agree the magistrate judge found that the "ALJ tried to characterize Dr. Naam's estimate as compatible with his own by suggesting that Dr. Naam was referring to only one extremity," but the magistrate judge found that the "record does not logically permit such an interpretation of Dr. Naam's report."
 
 
 [8]
 Based on Heldenbrand's testimony, the ALJ gave the VE a hypothetical that included a 20- to 25-pound lifting ability of the left hand: "[A]ssume the individual can lift up to ten pounds with the right hand, up to twenty to twenty-five pounds with the left hand." (R.77)
 
 
 [9]
 The magistrate judge found that "the ALJ purported to give Dr. Naam's opinions compelling and conclusive weight," ' but refused to recognize that Dr. Naam's restriction applied to "plaintiff's lifting capacity in general, not an estimate of the weight he was able to hoist with a single hand."
 
 
 [10]
 The ALJ's estimates for the weight of the milk and the 24-pack are accurate
 
 
 [11]
 The magistrate judge found that the ALJ repeatedly "challenged" Heldenbrand's testimony until Heldenbrand would "eventually concede[ ]," resulting in Heldenbrand's "equivocal description of his lifting abilities"
 
 
 [12]
 Dr. Naam indicated in a disability assessment form dated November 12, 1993 that Heldenbrand was restricted (perhaps for the right hand, perhaps for both) to carrying 5 pounds for a "maximum frequently (from 1/3 to 2/3 of an 8-hour day), and restricted to carrying 10 pounds maximum occasionally (from very little up to 1/3 of an 8-hour day). Similarly, Dr. Naam stated in the November 22, 1993 functional assessment form that Heldenbrand was restricted to lifting five pounds (R.315) Consistent (perhaps) with Dr. Naam's restrictions, Dr. Klinge indicated in a October 18, 1993 report that Heldenbrand was limited to lifting or carrying ten pounds. (R.301.)
 
 
 [13]
 The ALJ touched on the subject earlier in the hearing, also:
 ALJ Well, what kind of limitations do you have?
 A I--as long as I can work with my left hand, you know, if it ain't too bad I could get along pretty good probably, you know. Well, I could work, let's just put it that way, I can work a little, yes. (R.59)
 
 
 [14]
 Some cases have held that a claimant's unsuccessful efforts to secure employment result in his needing less evidence of disability than if he had made no such effort. See, e.g., Bartell v. Cohen 445 F.2d 80, 82 (7th Cir.1971) (employer's refusal to re-employ claimant, "a woman with 17 years of experience, ... militate[s] against the conclusion that [she] was capable" of working); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir.1995) ("Bentley's case must of course be distinguished from situations where the medical evidence uniformly supports a finding of disability; in such cases an unsuccessful work search may even reinforce a disability claim"); Walston v. Gardner, 381 F.2d 580, 587 (6th Cir.1967). These cases generally reason that if no employers have been willing to hire the individual, it supports a finding that he is too disabled to work. But cf Spencer v. Bowen, 798 F.2d 275, 278 (8th Cir.1986) (holding that receiving unemployment compensation does not support a finding of lack of credibility under facts in this case); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir1994) (applying for unemployment benefits, which requires statement that claimant is capable of working, is "clearly inconsistent with [his] claim of disability during the same period," thus undermining his credibility); Perez v. Secretary of Health Education and Welfare, 622 F.2d 1, 3 (1st Cir.1980) "[A]lthough we have reservations about the significance of such evidence, we are reluctant to say that a claimant's decision to hold himself out as able to work for the purpose of receiving unemployment benefits may never be considered on the issue of disability")
 
 
 [15]
 We note that financial constraints are a plausible reason to not seek further medical attention. See, e.g., Clark v. Shalala, 28 F.3d 828, 831 n. 4 (8th Cir.1994)
 
 
 [16]
 985 F.2d 234 (7th Cir1993)
 
 
 [17]
 We do not know how she arrived at the figure of nine years. In addition to Heldenbrand's testimony that he experienced chest pain on a regular basis, a medical note in October 1987 indicates that Heldenbrand reported chest pains "almost on daily basis." (R. 189) Dr. Hall, an orthopaedic surgeon, wrote on February 25, 1993 that he had reviewed Heldenbrand's medical records: "Dr. Shiffman on October 29, 1987 noted Mr. Heldenbrand's chest pain." (R.281)