**Joy A. WAYMIRE, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Administration, Defendant.**

**No. 99–4135–RDR.**

United States District Court,
D. Kansas.

July 24, 2000.

Thomas J. Leising, Topeka, KS, for plaintiff.

Nancy Landis Caplinger, Mary K. Ramirez, Office of United States Attorney, Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This is an action to review a final decision by the Commissioner of Social Security regarding plaintiff's entitlement to disability insurance benefits under the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

### I.

Plaintiff filed an application for disability benefits on April 11, 1996. She originally

alleged her disability began on June 1, 1992. She later amended this allegation to assert an onset date of April 11, 1995. Plaintiff indicated that she was disabled due to back pain and illiteracy. Plaintiff's application was denied initially and on reconsideration by the Social Security Administration (SSA). A hearing was ultimately conducted by an administrative law judge (ALJ) on plaintiff's application. On March 27, 1998, the ALJ determined in a written opinion that plaintiff was not entitled to disability benefits. On July 21, 1999, the Appeals Council of the SSA denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.

■■■ This court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater,* 82 F.3d 373, 375 (10th Cir.1996) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but we have the duty to carefully consider the entire record and make our determination on the record as a whole. *Dollar v. Bowen,* 821 F.2d 530, 532 (10th Cir.1987).

The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. *Reyes v. Bowen,* 845 F.2d 242, 243 (10th Cir. 1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir. 1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. *Id.*

## III.

Plaintiff was born on November 21, 1941. Plaintiff only went to school through the seventh grade. She has previously worked as a bindery worker, meat packager and house cleaner. She has not worked since at least April 1, 1995.

The medical records extend from 1980 to 1997. During the period from 1980 to 1991, plaintiff suffered a fractured left ankle, a fractured wrist, and pain in her right shoulder. On February 13, 1991, plaintiff was seen by Ron K. Warta, D.C. She complained of excessive and acute pain in the mid to lower thoracic spinal area with pain radiating. On examination, he found difficulty in rotation. He noted particular pain upon bending at the waist. X-rays were essentially negative. He provided chiropractic treatments for several days and recommended that she not work until March 4, 1991. On March 20, 1991, Dr. Warta found that plaintiff was able to sleep and perform most daily activities without pain. However, the problems had returned in early April 1991. Over the next few months, plaintiff's condition would improve and then worsen.

On June 17, 1991, she was examined by Sergio Delgado, M.D. Plaintiff told Dr. Delgado that she began experiencing aching and burning pain in her mid back in February 1991. She indicated that sitting, standing, walking and bending increase her discomfort. She said that the medication she was presently taking, Amitriptyline, was helping. Dr. Delgado found a normal range of motion in all areas. He noted minimal complaints related to the lower back with a normal lumbar lordosis and no paramlumbar spasm. Plaintiff had discomfort in the right sacroiliac joint, but no sciatic notch discomfort. Dr. Delgado found 20 percent decreased grip strength on the right and 10 percent on the left. He further found bilateral weakness of the upper extremities and upper back which he determined could represent generalized deconditioning. Dr. Delgado determined that plaintiff's "complaints as well as her

findings are compatible with degenerative arthritic changes involving mostly the thoracic spine which may be aggravated by her work activities." He concluded that she had a two percent whole person impairment. He opined: "Based on her job description and the fact that she does not do heavy lifting, it indicates that this patient should be able to continue in her previous work activities."

On November 11, 1992, plaintiff was tested by Jeffrey G. Simmons, vocational evaluation coordinator at the Menninger Return to Work Center. He sought to assess the impact of her physical condition on her ability to work. He ultimately determined that plaintiff had "experienced approximately a 38% loss in ability to access employment in the competitive labor market." He noted also that if her physical limitations increased then her percentage of loss would also increase.

Plaintiff was seen by P. Brent Koprivica, M.D., on April 15, 1994. She told Dr. Koprivica that she began developing a pulling and burning pain in the interscapular area of her back in the fall of 1990. She subsequently saw Dr. Warta and Dr. Delgado, but she did not improve. Dr. Koprivica found that plaintiff's greatest discomfort occurred on palpation in the mid axillary line overlying the lower rib cage. He noted a loss of functional motion of the cervical spine. Dr. Koprivica assessed chronic parathoracic pain with evidence of degenerative disease of the thoracic spine. He found that she had reached maximal medical improvement. He recommended permanent work restrictions of a light physical demand level. He determined that she had an eight percent whole person impairment.

On May 23, 1994, another labor market loss assessment was performed on plaintiff. This analysis was conducted by Dick Santner, M.S. He determined that plaintiff had lost 31 percent of her ability to perform work in the open labor market.

On February 1, 1996, plaintiff was seen by Stephen Saylor, M.D. She was complaining of pain in her right shoulder and right hip. He noted that her hands, wrists and other joints showed no overt evidence of acute inflammation. He assessed persistent arthralgias. She continued to suffer pain, particularly in the mid back and around the right rib cage. She saw Dr. Saylor again on April 3, 1996. She told him that she had suffered back pain since 1991, but that it had been acutely worse recently. Dr. Saylor found no acute inflammatory change on evaluation of any of her joints. He noted she was tender to palpation of her mid dorsal spine and right rib cage. He suggested that she might have fibromyalgia. He scheduled a rheumatologic consultation with J. Douglas Gardner, M.D., a specialist in rheumatology.

On April 29, 1996, plaintiff was seen by Dr. Gardner. He found tender points along the medial scapular border on both sides, somewhat more prominent on the right than the left. Plaintiff was able to flex only to 46 degrees and complained of pain in her back. Dr. Gardner noted that straight leg raising was negative and her gait was normal. He diagnosed chronic back pain with dysesthesias which are long-standing. Imaging studies of plaintiff's back and cervical spine were unrevealing. Dr. Gardner found no evidence of vasomotor abnormalities. He recommended an exercise regimen for her back pain. He further suggested that she follow up with Dr. Saylor.

Plaintiff was seen on May 10, 1996 by Arthur D. McKenna, Ph.D., for a psychological examination. Dr. McKenna noted that plaintiff walked slowly and stiffly. He found that her pace and persistence were adequate. He noted that she performed poorly on the verbal tests, but he found that these results reflected her limited education. He determined that plaintiff had an IQ of 81, which was low average. He made the following observations:

> Her legal involvement, substance abuse and work history suggest that she has a low probability of having difficulty interacting and working with others. She has limited education. She does not ap-

pear to have interpersonal difficulties. Her mood, thought process, and orientation will probably not interfere with her ability to complete work assignments and follow instructions. She understands and follows simple verbal instructions but she would have some difficulty understanding and following complex verbal instructions and written instructions. She does not appear to be physically fit. Ms. Waymire can manage her own funds because she has the ability to perform activities of daily living, she has adequate reasoning and problem-solving abilities, and she understands her financial obligations.

On September 28, 1996, plaintiff was seen by James G. Henderson, M.D., for a consultative physical examination. Plaintiff complained of problems with her "back, right heel spur, and tendonitis of the right shoulder." Dr. Henderson found a full range of motion in all joints except for her shoulder joints. He noted that plaintiff suffered pain in the right shoulder. He also noted pain in the thoracic spine region. He found mild to moderate difficulty with orthopedic maneuvers. There was no evidence of muscle spasm, and no inflammatory change or radiculopathy was noted. He diagnosed multiple arthralgias.

An x-ray of plaintiff's lumbar spine on November 1, 1996 showed only mild to moderate degenerative arthritis. The disc spaces were unremarkable.

Plaintiff received treatment for soreness in her right heel in November and December of 1996 from David E. Thurston, M.D. Dr. Thurston gave plaintiff a steroid injection and this provided "good results." She subsequently underwent surgery on her foot on December 23, 1997.

Plaintiff was seen by George Varghese, M.D., on December 11, 1996. Plaintiff reported back pain and right foot pain to Dr. Varghese. Dr. Varghese found tenderness in the right trapezius and pectoral region. He further found that plaintiff's range of motion was normal except for limited rotation of the neck. He reached the following conclusions:

Based on this examination, she will have limitation with the use of the right arm, especially if it is done overhead level. My opinion is that she should limit overhead activities using the right arm to an occasional basis. Lifting above shoulder level also should be limited with the right upper extremity. She did not appear to have any problem with fine and gross motor activities or handling objects with both hands. I could not find any objective evidence that could limit her walking, standing or traveling.

On March 10, 1997, Stanley Mintz, Ph.D. conducted a psychological examination of plaintiff. Dr. Mintz found no evidence of a personality disorder. He determined that plaintiff functioned within the low average intellectual range with similar levels of memory functioning. He found that plaintiff could understand simple and intermediate instructions and appeared to relate adequately to co-workers and supervisors. He further found that her concentration capacity appeared adequate.

At the hearing before the ALJ, plaintiff testified that she was fifty-six years old and had been disabled since April 11, 1995. She stated that she had not worked since June 1, 1992. She has difficulty with reading, writing and math. She indicated that she could stand for twenty to thirty minutes at a time. She said her back and foot begin to hurt after that period. She also has trouble sitting. She can sit for up to an hour if she is sitting on something soft. She is able to walk about four blocks at a time. She is able to lift about ten pounds. She has considerable trouble with bending. She has no trouble seeing, hearing or speaking. An ordinary day for the plaintiff consists of few activities. She does occasionally do some cooking, dusting and sweeping. She does a load of laundry every day. She said that she used to do a lot of craft work, but her pain does not allow that anymore.

Amy Salva, vocational expert, also testified at the hearing. Ms. Salva indicated that plaintiff's previous work as a meat

packager was light, unskilled work. She indicated that plaintiff's previous work as a bindery operator was light, semiskilled work. The ALJ posed a hypothetical question based on an individual of plaintiff's age, education and work experience and is essentially illiterate with poor math skills but who has the residual functional capacity to perform light work with limitations of occasional bending, squatting, stooping and twisting. In response, Ms. Salva initially indicated that this individual could not perform past relevant work as a meat packager or housekeeper. She was uncertain at that time concerning the individual's ability to perform as a bindery operator because she was not sure how much bending was required for that position. She further testified that there was at least one other position in the national economy that such a person could perform—airline security worker. Following the hearing, Ms. Salva provided information to the ALJ that the position of bindery operator as it is performed in the national economy does not require bending.

The ALJ initially determined that plaintiff had not engaged in substantial gainful activity since April 11, 1995. She further determined that plaintiff did not suffer from a listed impairment, but that she did have mild to moderate degenerative arthritis of the lumbar spine; questionable hyeresthesia in area of T8; status post fracture of left wrist in 1988, without residual difficulty; and an average IQ of 98, but is functionally illiterate. She also found the testimony of the plaintiff not credible for a variety of reasons. She concluded that plaintiff had the residual functional capacity to perform work which required lifting no more than ten pounds frequently or 20 pounds occasionally, and no more than occasional bending, squatting, twisting or stooping. She further found that plaintiff's functional illiteracy prevented work activity requiring reading or writing. The ALJ determined that plaintiff's residual functional capacity permitted her to perform her past relevant work as a bindery operator, as that work is performed in the national economy. She alternatively found, based on the testimony of the vocational expert, that plaintiff could perform other jobs which existed in significant numbers in the national economy, including the job of airline security. Accordingly, she concluded that plaintiff was not disabled.

### IV.

Plaintiff contends that the ALJ erred in concluding that she could perform her past relevant work. She notes that the ALJ failed to consider her testimony that her work as a bindery operator required bending. She further argues that, absent a finding that she could perform her past relevant work, the application of the medical vocational guidelines would have dictated a finding that she was disabled.

Having carefully and thoroughly reviewed the record, the court finds that there is substantial evidence to support the ALJ's determination. Plaintiff does suffer from some impairments, but we are not persuaded that she is disabled by them. The ALJ conducted a comprehensive review of the record. She carefully examined the medical record. She viewed this record in light of the testimony offered by the plaintiff during the hearing.

In reaching the aforementioned decision, the court determined that the ALJ had properly evaluated the credibility of plaintiff. In evaluating the credibility of a claimant, an ALJ must consider and weigh a number of factors in combination. *See Huston v. Bowen*, 838 F.2d 1125, 1132 & n. 7 (10th Cir.1988). The court recognizes that the ALJ is " 'optimally positioned to observe and assess witness credibility.' " *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir.1996) (quoting *Casias v. Secretary of Health and Human Services*, 933 F.2d 799, 801 (10th Cir.1991)). Therefore, the court may overturn such a credibility determination only when there is a conspicuous absence of credible evidence to support it. *See Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992). The court

finds that the ALJ's credibility determination of plaintiff's testimony was properly linked to substantial evidence in the record. She noted the following: (1) medical evidence supporting the conclusion that plaintiff was not disabled; (2) the failure of any doctor that examined plaintiff to indicate that she was disabled; (3) the sparsity of treatment sought by plaintiff; (4) the receipt of only conservative treatment by plaintiff; (5) plaintiff's overall work history; and (6) plaintiff's daily activities. We must conclude that the ALJ's assessment of plaintiff's credibility was closely and affirmatively linked to substantial evidence. *See Winfrey v. Chater,* 92 F.3d 1017, 1020 (10th Cir.1996).

■ Finally, we turn to the issue raised by the plaintiff. She has suggested that the ALJ erred in concluding that she could perform her past relevant work. We must disagree. The ALJ found that plaintiff could perform her past relevant work as a bindery operator because she could perform the functional duties and demands of that work as it is usually performed in the national economy. Such a finding is entirely consistent with the established law. *See Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045, 1051 (10th Cir.1993) ("[C]laimant bears the burden of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy."). Because the evidence showed that plaintiff could return to her past relevant work as a bindery operator as that work is performed in the national economy, the burden did not shift to the Commissioner to show other work that plaintiff could perform and the testimony of a vocational expert was not required. *Glenn v. Shalala,* 21 F.3d 983, 988 (10th Cir.1994). Nevertheless, the ALJ solicited the testimony of a vocational expert to assist in the development of the requirements of plaintiff's past relevant work. The ALJ properly considered the voca-

tional expert's testimony and subsequent information. We find no error in the ALJ's decision.

In sum, the court finds that the decision of the ALJ is supported by substantial evidence. Accordingly, the decision of the ALJ must be affirmed.

**IT IS SO ORDERED.**