821 F.2d 530
 18 Soc.Sec.Rep.Ser. 117, Unempl.Ins.Rep. CCH 17,397
Arthur V. DOLLAR, Plaintiff-Appellant,
v.
Otis R. BOWEN, M.D., Secretary of the United States
Department of Health and Human Services, Defendant-Appellee.
 No. 85-1528.
 United States Court of Appeals,
Tenth Circuit.
 June 16, 1987.
 
 Eric G. Melders, Oklahoma City, Okl., for plaintiff-appellant.
 Thomas Stanton, Asst. Regional Atty., Dallas, Tex. (Edwin L. Meese, U.S. Atty. Gen., Roger Hilfiger, U.S. Atty. for the E.D. of Oklahoma and Gayla Fuller, Regional Atty., Dallas, Tex., with him on the brief), for defendant-appellee.
 Before McKAY and ANDERSON, Circuit Judges, and JOHNSON*, District Judge.
 PER CURIAM.
 
 
 1
 The case of plaintiff Arthur V. Dollar has followed a rather complicated procedural history. For purposes of this appeal, it is sufficient to state that Mr. Dollar applied for disability benefits pursuant to the Social Security Act, 42 U.S.C. Secs. 301-1397f (1982 & Supp. III 1985), on November 18, 1981, alleging that he became disabled on or about February 27, 1980. The administrative hearing from which the present appeal is taken was ultimately held on January 11, 1984, and the Administrative Law Judge [ALJ] rendered a recommended decision on February 13, 1984, denying Mr. Dollar's disability claim pursuant to 20 C.F.R. Secs. 404.1501-.1598 and apps. 1-2 (1981) (the regulations in effect at the time this claim was filed). The ALJ's recommended decision was subsequently adopted, after slight modifications, by the Appeals Council of the Social Security Administration, Department of Health and Human Services. The matter is now before this court following Mr. Dollar's unsuccessful appeal to the United States District Court for the Eastern District of Oklahoma.
 
 I.
 
 2
 Mr. Dollar is a male Caucasian who was forty-five years of age at the time of his administrative hearing. He contends that he became unable to continue work as a welder on February 27, 1980, due both to the effects of pain in his back, shoulders, and knees and to problems caused by lung disease. Mr. Dollar's "long history" of lung and back trouble stem from chronic obstructive lung disease of the left lung and degenerative disc disease of the lower back, complicated by osteoarthritic changes. Report of Robert E. Engles, M.D., F.A.C.S., record, vol. 2, at 215. There is no dispute that the results of Mr. Dollar's pulmonary tests approximate, but do not actually meet, the threshold for impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1, that were applicable as of the date of the ALJ's recommended decision. If the prerequisites for one of the listed impairments had been met, a designation of disability would have been automatic pursuant to 20 C.F.R. Sec. 404.1520(d).
 
 
 3
 Mr. Dollar also has an intellectual deficiency. The Secretary's examiners reported that, although Mr. Dollar has an eighth grade education, he is functionally illiterate. His full scale IQ of 86 is within the dull-normal range of intellectual ability. See Psychological Evaluation, record, vol. 2, at 106-07; Report of John R. Adair, M.D., id. at 158-59. Mr. Dollar testified that, although he could sign his name, he could not read or write.
 
 
 4
 In his recommended decision, the ALJ summarized the reports of five physicians who had examined Mr. Dollar. Id. at 9-10. The physical examination by William C. Moore, M.D., revealed that Mr. Dollar had limited movement in the lumbar spine, that it was "more painful for Mr. Dollar to stand on the heels than on the toes," id. at 177, and that it was "more painful to flex than to extend the back." Id. Dr. Moore's X-ray examination confirmed scoliosis with convexity to the right and a narrowing of intervertebral spaces at the L-5 and S-1 levels. Dr. Moore opined that Mr. Dollar had sustained a ruptured intervertebral disc and was thirty percent permanently disabled as a result of his back problems alone. See id. at 177-78.
 
 
 5
 Griffith C. Miller, M.D., examined Mr. Dollar in connection with his application for worker's compensation benefits. He opined that Mr. Dollar was totally and permanently disabled as a result of his back and lung injuries. See id. at 175. Mr. Dollar's regular physician, Dr. Robert E. Engles, voiced the identical view. Id. at 215.
 
 
 6
 Raymond J. Dougherty, M.D., a board certified specialist in pulmonary diseases who examined Mr. Dollar in connection with a worker's compensation claim, testified that Mr. Dollar had: (1) marked chronic obstructive pulmonary disease; (2) chronic bronchitis; and (3) thickening of the pleura in the left lower lung zone with loss of volume of the left hemothorax and bilateral lower lung zone infiltrates, cause undetermined. He concluded, "There is a 70% impairment to the whole man." Id. at 199. He further explained that Mr. Dollar was in fact 100% disabled as a result of his lung problems, but that the worker's compensation guidelines only allowed a disability of 70% for a lung condition. Id. at 195-96.
 
 
 7
 In marked contrast to these four reports, John R. Adair, M.D., a physician retained by the Secretary, concluded that Mr. Dollar suffered only from a mild restrictive and obstructive pulmonary ventilatory defect and from muscular imbalance of the back. Id. at 159. The ALJ evidently relied heavily upon the report and testimony of Dr. Adair in finding that Mr. Dollar had "mild" lung and back disease,[1] finding 3, id. at 11, and in concluding that Mr. Dollar was not suffering from a disability.
 
 II.
 
 8
 We must decide whether the district court's holding--that the Secretary's decision that Mr. Dollar was not disabled and not entitled to disability benefits--was supported by substantial evidence in the record. The "substantial evidence" standard, codified at 42 U.S.C. Sec. 405(g), has been defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' It must be 'more than a mere scintilla.' " Broadbent v. Harris, 698 F.2d 407, 414 (10th Cir.1983) (per curiam) (citations omitted). Although a reviewing court cannot weigh the evidence and may not substitute its discretion for that of the agency, it nevertheless has the duty to meticulously examine the record and make its determination on the record as a whole. Id. In applying the substantial evidence standard, the Tenth Circuit has recognized:
 
 
 9
 The claimant bears the burden of proving a disability within the meaning of the Social Security Act. 42 U.S.C. Sec. 423(d)(5). Once the claimant makes a prima facie showing of disability that prevents his engaging in his prior work activity, however, the burden of going forward shifts to the Secretary, who must show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy. Id. Sec. 423(d)(2)(A).
 
 
 10
 Channel v. Heckler, 747 F.2d 577, 579 (10th Cir.1984) (per curiam) (citations omitted).
 
 
 11
 The ALJ's finding that Mr. Dollar was unable to perform his past relevant work as a welder, finding 6, record, vol. 2, at 12, indicates that Mr. Dollar met his initial burden of proof. Consequently, the evidentiary burden shifted to the Secretary to show (1) that Mr. Dollar retained the capacity to perform an alternative work activity, and (2) that this specific type of job existed in the national economy. See Channel, 747 F.2d at 579. We need only reach the former issue in disposing of this case.
 
 III.
 
 12
 Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs." 20 C.F.R. pt. 404, subpt. P, app. 2, Sec. 200.00(c) (emphasis added). The ALJ found that Mr. Dollar had an RFC to "perform the full range of light work." Finding 7, record, vol. 2, at 12.
 
 
 13
 Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [he] must have the ability to do substantially all of these activities.
 
 
 14
 20 C.F.R. Sec. 404.1567(b) (emphasis added).
 
 
 15
 The record fails to provide substantial evidence that Mr. Dollar was able to perform all the activities described in the regulation, particularly that he was able to do "a good deal of walking or standing." The ALJ obviously relied heavily on the testimony of Dr. Adair, the physician retained by the Secretary, who concluded that Mr. Dollar "has a problem more with illiteracy than anything else. His physical capacity, I believe, exceeds what he has reported by quite a bit." Record, vol. 2, at 159. In evaluating sufficiency of the evidence, however, we must avoid relying upon Dr. Adair's testimony to the exclusion of the reports of the other examining physicians.
 
 
 16
 "[B]ecause of the helter-skelter nature of the records in these cases, ... (courts must) not adopt the facile way of disposing of an injured applicant's case by reference to, and reliance upon, the statements of one or two physicians, as against the considered statements of many physicians and surgeons who have had more opportunity of examining and treating the applicant, more occasions of making medical reports upon him, and more expertness in diagnosis...."
 
 
 17
 Broadbent, 698 F.2d at 414 (quoting Davidson v. Gardner, 370 F.2d 803, 823 (6th Cir.1966)); cf. Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir.1987) (reports of government's consulting physicians who never examined claimant "have less credence than contrary views of treating physicians") (citations omitted); Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir.1985) (evidence insubstantial if overwhelmed by evidence of treating physician).
 
 
 18
 Dr. Engles, Mr. Dollar's regular physician, reported that "at the present time [Mr. Dollar] is only able to walk one block without having shortness of breath, and after walking for the one block has to sit down and rest because of the shortness of breath." Record, vol. 2, at 108. Such evidence accords with Dr. Engles' ultimate conclusion that Mr. Dollar was totally disabled,[2] a conclusion that is inconsistent with the criteria for a capacity to perform light work.
 
 
 19
 Even Dr. Adair reported that Mr. Dollar "gets short of breath on just about any type of exercise.... He can't exactly state how far he can walk but he doesn't feel like he can keep up with someone his own age any at all.... He does get short of breath when he is lying down or sometimes just sitting." Id. at 157. Dr. Adair also testified that Mr. Dollar could walk "comfortably" for three to four blocks and could stay on his feet for thirty to forty-five minutes at a time. Id. at 158. Thus, statements regarding Mr. Dollar's functional capacity from the Secretary's own examiner fail to establish that he could perform a good deal of walking or standing on a sustained basis. Because his conclusions run counter to those of Mr. Dollar's regular treating physician, Dr. Engles, as well as three other physicians who examined Mr. Dollar for work-related conditions or worker's compensation purposes, Dr. Adair's report fails to provide substantial evidence for the Secretary's decision.
 
 
 20
 Moreover, Dr. Adair's characterization of Mr. Dollar's pulmonary impairment as "mild" is not supported by the objective tests upon which his report ostensibly relies. The pulmonary test results were very close to the prerequisites for an automatic finding of disability.[3] The medical technician noted that Mr. Dollar "cooperated [and] understood instructions," id. at 168, thus indicating that he was not attempting to exaggerate his condition during testing. Dr. Dougherty, a pulmonary function specialist, interpreted his pulmonary function tests as demonstrating a "marked obstructive ventilatory impairment." Id. at 198; cf. id. at 201, 202 (pulmonary function test results). Even the Secretary plainly concedes on appeal that Mr. Dollar's lung disorder is "severe."[4] Brief of Appellee at 18.
 
 IV.
 
 21
 Our holding that the record fails to provide substantial evidence to support the ALJ's conclusion that Mr. Dollar was capable of performing the full range of light work does not automatically dictate an award of benefits. Because of its conclusion, the ALJ did not determine whether Mr. Dollar was capable of performing sedentary work, the sole classification requiring less physical exertion than light work. In such a case, remand for additional fact finding is generally required. However, outright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose. See Harris v. Secretary of Health & Human Serv., 821 F.2d 541, 544-545, (10th Cir.1987).
 
 
 22
 Even if Mr. Dollar is found to have an RFC to perform sedentary work, he is disabled as a matter of law under the regulations. For individuals aged forty-five to forty-nine, as is Mr. Dollar,
 
 
 23
 (1) who are restricted to sedentary work, (2) who are unskilled or have no transferable skills, (3) who have no relevant past work or who can no longer perform vocationally relevant past work, and (4) who are either illiterate or unable to communicate in the English language, a finding of disabled is warranted.
 
 
 24
 20 C.F.R. pt. 404, subpt. P, app. 2 Sec. 201.00(h).
 
 
 25
 For purposes of this appeal, we will assume Mr. Dollar was able to perform sedentary work. As mentioned, the ALJ conceded the third factor. The only remaining factors to consider, therefore, are whether Mr. Dollar was illiterate and whether his skills were transferable.
 
 
 26
 In reaching his conclusion of not disabled, the ALJ classified Mr. Dollar according to his eighth grade schooling, and placed him in the category of "limited or less" education. See findings 9, 11, record, vol. 2, at 12; 20 C.F.R. pt. 404, subpt. P, app. 2, Table I. This classification presumes literacy with "ability in reasoning, arithmetic, and language skills," 20 C.F.R. Sec. 416.964(b)(3), and literacy under the grids requires the ability to read and write. See id. at Sec. 404.1564(b)(1); Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir.1987).
 
 
 27
 Use of a numerical grade level to determine educational abilities is only appropriate "if there is no other evidence to contradict it." 20 C.F.R. Sec. 416.964(b). The record establishes that Mr. Dollar, although able to sign his name, was functionally illiterate and able to manage only simple financial transactions that do not require reading or writing. Record, vol. 2, at 95, 106-17, 158. A review of the record has revealed absolutely no evidence to the contrary. Even the physician retained by the Secretary referred to Mr. Dollar as illiterate. See id. at 159. As a matter of law, the application of grid rules based on his eighth grade education was in error. Thus, the record does not contain substantial evidence to support the ALJ's implicit finding that Mr. Dollar was literate.
 
 
 28
 The only evidence in the record regarding skill transferability is the testimony of Dr. Sanders, an occupational expert retained by the Secretary. He described the skills of a welder as follows:
 
 
 29
 [H]e had to be able to follow very good instructions. He had to be able to utilize his hand and finger dexterity, good visual acuity, knowledge of looking at certain prints ... even though the record indicates and he stated he could not read but there is a certain basic framework, guidelines that you have to utilize in welding. So he would have a lot of skills in those areas that would enable him to, you know, function in other related or family, job families. Those certain kinds, or types of things are transferable into all kinds of unskilled related jobs.
 
 
 30
 Record, vol. 2, at 49 (emphasis added). He suggested that Mr. Dollar's skills were transferable to such light work as mini-storage watchman, car wash attendant, mobile home park manager, and lift truck operator because they were "jobs that would require no special training that would merely require on the job orientation; jobs that were simplistic in nature and that would be classified as far as light or sedentary to light...." Id. at 49-50 (emphasis added). Accepting the testimony of the occupational expert, the ALJ determined that Mr. Dollar's skills were transferable to various light work categories such as those mentioned by the occupational expert. Finding 10, id. at 12.
 
 
 31
 We can sustain a conclusion of transferable skills to light (or at this point sedentary) work only "when the skilled or semi-skilled work activities ... in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. Sec. 404.1568(d)(1) (emphasis added). In other words, the light work activities must be skilled or semi-skilled in nature rather than unskilled. Factors to be considered include whether (1) the same or lesser skill level is required, (2) the same or similar tools or machines are used, and (3) the same or similar raw materials, products, processes, or services are involved. See id. at Sec. 404.1568(d)(2).
 
 
 32
 The occupational expert and the ALJ appear to have mistakenly assumed that skills are considered transferable if the worker can shift from skilled to unskilled labor. Instead, transferability is based on an entirely different regulatory framework. As noted, the regulations specifically provide that skills are considered transferable only when they "can be used to meet the requirements of skilled or semi-skilled work activities of other jobs...." Id. at Sec. 404.1568(d)(1). The occupational expert's statements that the jobs which Mr. Dollar could perform require "no special training," are "simplistic in nature," and "are really quite boring, to be very honest," record, vol. 2, at 49-50, 52, suggest that the identified light job categories involved neither skilled nor semi-skilled work activities. In short, the testimony fails to meet the first test of transferability; that is, it fails to demonstrate that the alternate work activities required the same or lesser skill level. As the regulation quoted above makes clear, the term "lesser skill level" is not the equivalent of no skill requirements.
 
 
 33
 Furthermore, the record is completely devoid of any evidence that would satisfy the requirements of the second and third transferability factors, i.e., sameness or similarity of tools or machines, the sameness or similarity of raw materials, products, processes, or services. The tools, processes, or services inherent in welding not only seem particularly dissimilar to those involved in the light work previously described (car wash attendant, watchman, etc.) but also to skilled or semi-skilled sedentary jobs. The regulations describe most sedentary jobs as falling "within the skilled, semi-skilled, professional, administrative, technical, clerical, and benchwork classifications." 20 C.F.R. pt. 404, subpt. P, app. 2 Sec. 201.00(a). Only the benchwork classification holds any promise of involving similar machines, processes, or services, or similar skill level for that matter.
 
 
 34
 Rather than proving that Mr. Dollar's skills were transferable to skilled or semi-skilled sedentary work, the vocational testimony offers no evidence that they were even transferable to skilled or semi-skilled light work categories. The Secretary has not met his burden of coming forward with substantial evidence of skill transferability, even for light work, and we see no sound reason to give the Secretary a second chance to build the record. Furthermore, given the nature of Mr. Dollar's skills as a welder, combined with his age and his illiteracy, the likelihood of transferability to any more than a narrow range of skilled or semi-skilled sedentary benchwork is virtually foreclosed. If his skills are considered untransferable, or if he is considered unskilled, then the regulations provide that a finding of disability is warranted. In other words, the Social Security Administration acknowledges that someone of Mr. Dollar's age, who is illiterate and has nontransferable work skills, is not considered realistically to be able to perform either skilled or unskilled sedentary work. See 20 C.F.R. pt. 404, subpt. P, app. 2 Sec. 201.00(h).
 
 V.
 
 35
 We thus conclude that the record fully supports a determination that Mr. Dollar was disabled as a matter of law and is entitled to benefits. Just as in Frey v. Bowen, 816 F.2d 508 (10th Cir.1987), the Secretary failed to meet its burden and erroneously rejected the treating physicians' testimony and reports, while the claimant has been attempting to obtain benefits for six years. "[W]e believe that further administrative proceedings would only further delay the appropriate determination and award of benefits." Dixon, 811 F.2d at 511. Therefore, we REVERSE the decision of the district court and REMAND to the Secretary for immediate calculation and award of benefits.
 
 
 
 *
 Honorable Alan B. Johnson, United States District Judge for the District of Wyoming, sitting by designation
 
 
 [1]
 This finding appears to us to be inconsistent with his further finding that Mr. Dollar had an RFC to do only light work. See finding 7, record, vol. 2, at 12. A prerequisite for a light work classification is that the claimant must suffer from "severe medically determinable impairment(s)." 20 C.F.R. pt. 404, subpt. P, app. 2, Sec. 202.00 (emphasis added)
 
 
 [2]
 Such evidence is also consistent with the non-medical testimony of Carol Dollar, the claimant's brother. He described his brother's attempt to work for him as follows:
 Q. And what type of work do you do?
 A. We do landscapin' and movin' trees, transplantin' them.
 Q. O.K. And what type of work did A.V. Dollar attempt to do for you?
 A. Well, he was just helpin' in general. Just whatever we had to do.
 Q. Did he have to do any lifting on the job?
 A. Yes, some.
 Q. And he had to do a lot of walking, moving around?
 A. Well, yeah INAUDIBLE
 Q. O.K. How was he, how did he do?
 A. Well, I wouldn't say he done good. He just couldn't do much.
 Q. O.K. If he worked awhile, would he have to take off and rest a little while?
 A. That's right.
 Q. About how long could he work before he'd have to take a time out?
 A. Well, INAUDIBLE 10, 15 minutes at a time that he could work and he'd just sit down and rest a while. He could rest up a little bit and get up and work a few more minutes.
 Q. Did he ever work a complete eight-hour day?
 A. Not that I know of.
 Q. Did he eventually leave working for you?
 A. Yes, sir.
 Q. Why?
 A. He just got to where he couldn't do nothin.
 Record, vol. 2, at 45-46.
 
 
 [3]
 20 C.F.R. pt. 404, subpt. P, app. 1, Sec. 3.02, Table I, as incorporated by 20 C.F.R. Sec. 404.1520(d), dictates a finding of disability for an individual of Mr. Dollar's height whose pulmonary function test results are: (1) FEV1 (forced expiratory volume) equal to or less than 1.4 liters; and (2) MVV (maximum voluntary ventilation) equal to or less than 47 liters per minute. "The reported 1 second forced expiratory volume (FEV 1 ) should represent the largest of at least three attempts. One satisfactory maximum voluntary ventilation (MVV) is sufficient." 20 C.F.R. pt. 404, subpt. P, app. 1, Sec. 3.00D. The studies should ideally be done twice, once before and once after administration of a nebulized bronchodilator. Id. In order to be determined automatically disabled under Table I, an individual must satisfy both the FEV 1 and MVV criteria. See id. at Sec. 3.02
 The Pulmonary Function Study results contained in Dr. Adair's report reveal that Mr. Dollar's FEV1 values ranged from a low of 1.35 liters before administration of bronchodilators to a high of 1.68 liters afterwards. Those same study results indicate that Mr. Dollar's MVV was 64 liters per minute before bronchodilators but afterwards fell to 56 liters per minute. Record, vol. 2, at 168. Thus, certain of Mr. Dollar's test results were equal to or less than the values listed in Table I, while others were not. Consequently, an automatic finding of disabled was not dictated for Mr. Dollar.
 
 
 [4]
 Recent modifications in the listing of impairments place Mr. Dollar even closer to a finding of automatic disability. Among other changes, the FEV1 and the MVV values prompting a ruling of automatic disability for an individual of Mr. Dollar's height were raised to 1.6 liters and to 64 liters per minute, respectively. See 20 C.F.R. pt. 404, subpt. P, app. 1, Sec. 3.02, Table I (1986). These compare closely to Mr. Dollar's maximum results of an FEV1 of 1.68 liters and an MVV of 64 liters per minute