**Robert D. DAVENPORT, Plaintiff,**

v.

**Kenneth APFEL, Commissioner of Social Security, Defendant.**

**No. 99–4118–RDR.**

United States District Court,
D. Kansas.

Feb. 21, 2001.

Steven M. Tilton, Tilton & Tilton, LLP, Topeka, KS, for plaintiff.

D. Brad Bailey, Office of U.S. Atty., Topeka, KS, for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action to review a final decision by the Commissioner of Social Security regarding the entitlement of Robert D. Davenport to Child's Supplemental Security Income (SSI) Benefits under Title XVI of the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

### I.

Plaintiff's mother, Susan A. Davenport, submitted an application for SSI benefits on behalf of Robert on March 20, 1995. In the application, plaintiff's mother stated that Robert's disability began on March 1, 1995. His disability was described as attention deficit hyperactivity disorder (ADHD), speech delay and heart murmur. The application was denied initially and on reconsideration by the Social Security Administration (SSA). A hearing was ultimately conducted by an administrative law judge (ALJ) on June 13, 1996. On August 30, 1996, the ALJ determined in a written opinion that Robert was not entitled to SSI benefits. On December 24, 1997, the Appeals Council of the SSA granted plaintiff's request for review and remanded for consideration of plaintiff's claim in light of the Personal Responsibility and Work Opportunity Act, Pub.L. No. 104–193, 110 Stat. 2105. Another hearing before an ALJ was conducted on March 16, 1998, pursuant to the order of remand. On April 23, 1998, the ALJ determined that Robert was not entitled to SSI benefits. On June 15, 1999, the Appeals Council denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### II.

This court reviews the Commissioner's decision to determine whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Services*, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater*, 82 F.3d 373, 375 (10th Cir.1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct.

1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but we have the duty to carefully consider the entire record and make our determination on the record as a whole. *Dollar v. Bowen,* 821 F.2d 530, 532 (10th Cir.1987).

■ The ALJ is required to apply a three-step analysis evaluation in cases such as this one. *Brown v. Callahan,* 120 F.3d 1133, 1134 (10th Cir.1997). First, the ALJ must determine if the child was engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If so, the child is not disabled. 20 C.F.R. § 416.924(b). If the child is not engaged in substantial gainful activity, the ALJ had to determine whether the child had a severe impairment. If not, the child is not disabled. 20 C.F.R. § 416.924(c). If the child had a severe impairment, the ALJ had to determine whether the impairment met or equaled an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing). 20 C.F.R. § 416.924(d). If a Listing was met or equaled, the child would be deemed disabled. 20 C.F.R. § 416.924(d)(1). If the child's impairment or impairments do not meet, medically equal, or functionally equal in severity a listed impairment, the child is not disabled. See 20 C.F.R. § 416.924(d)(2). Thus, to be eligible for disability benefits, Robert must satisfy two criteria. First, he must have an impairment that results in marked and severe functional limitations. He satisfies this criterion if his impairment matches one of those described in the Listing. Second, the impairment must have lasted or can be expected to last for a continuous period of at least 12 months.

## III.

Robert was born on January 1, 1988. He was ten years old at the time of the second hearing before an ALJ. As would be expected, Robert has never engaged in substantial gainful activity.

The record does contain some medical reports concerning Robert's infancy, but the more significant reports begin in early 1992, when Robert was four years old. At that time, Robert was subjected to a series of tests. The tests showed that Robert exhibited some age level skills and abilities. They also revealed low speech and verbal scores. Robert's fine motor skills were his most significant area of weakness. Speech and occupational therapy classes were recommended for Robert.

On December 2, 1994, Robert was seen by Leone Mattioli, M.D. at the Pediatric Cardiology Clinic at the Kansas University Medical Center. Robert was sent there after a routine physical examination revealed a heart murmur. Dr. Mattioli found Robert asymptomatic from a cardiovascular standpoint. He found that Robert did have functional murmurs, but he believed that they would disappear with growth. He scheduled another examination in one year.

In early 1995, Robert's teacher at his elementary school was contacted. She noted that Robert had some minor behavioral problems, but nothing that was severe enough that she would consider a behavior disorder. She did note that he did have difficulty concentrating and staying on task. She believed that an evaluation for attention deficit disorder might be necessary. She further noted that he did have difficulties with his speech. She, however, stated that she could understand him and she believed that most people could understand him.

In May, 1995, Robert was examined and evaluated by Stanley Mintz, Ph.D. Dr. Mintz found that Robert exhibited symp-

toms of ADHD and speech dysfunction. He noted that he did not appear to exhibit symptoms of other psychotherapy.

On July 10, 1995, Robert was seen by Daniel Katz, M.D. Dr. Katz concluded that it was probable that Robert had ADHD. He was uncertain as to the cause of the problem. Dr. Katz suggested that Ritalin be prescribed for Robert on trial basis.

Robert was seen again by Dr. Mattioli on September 1, 1995. Dr. Mattioli found no symptoms and normal growth. He determined that Robert has a functional murmur with no evidence of organic heart disease. He suggested a return visit in three years.

In September 1995, Robert began treatment with the Menninger Clinic. On September 18, 1995, Robert was examined by Stephen Kowalski, M.D. Dr. Kowalski reached the following diagnosis:

> This boy suffers from an Attention Deficit Hyperactivity Disorder of a Combined Type and of a Moderate to Moderate Severe Severity. He has more of an impulsive problem rather than an inattentive one. This appears to be familial pattern as both his siblings as well as his mother appear to suffer from the same disorder. In addition he suffers from an articulation problem as well as Dyslexia. This problem is well recognized by the school and is being addressed. The boy will need to have psychostimulant medication and parent guidance.

He identified Robert's prognosis as "good, with treatment." He found that Robert's current Global Assessment of Functioning (GAF) was 55, which indicated moderate symptoms. Dr. Katz prescribed Methylphenidate and Clonidine.

On October 24, 1995, a speech-language pathologist with his school district determined that Robert no longer needed speech therapy. Testing in October re-vealed that growth had occurred over the summer with regard to Robert's speech skills.

Over the next few years, Robert was followed by personnel at the Menninger Clinic. On August 23, 1996, Robert's grandmother reported to Menninger personnel that Robert continued to have temper outbursts and physical fights.

Robert, his mother and grandmother attended a session at the Menninger Clinic on September 16, 1996. At that time, some improvement was noted in temper outbursts and physical fights. Robert continued to have good reports concerning his behavior in November and December 1996. On December 30, 1996, it was reported that Robert "no longer has problems with fighting at school, although grandmother reports fighting is still a problem with his siblings."

At another session at the Menninger Clinic on January 20, 1997, it was reported that Robert continued to like school and was having few behavioral problems. His mother reported, however, that at home he still got irritable and physically aggressive, particularly towards his younger sister.

At some time prior to his next session, Robert began living with his maternal grandmother. On March 27, 1997, she reported that he was adjusting well to his new living arrangements. She noted that he was sleeping well, but there were more hyperactivity and attention difficulties during the day.

Over the course of the next few months, Robert experienced few problems. He had no behavior problems at school. He was playing football and he was active in Boy Scouts. In December 1997, Robert's grandmother reported that he continued to struggle in school academically. She believed that these problems were due to his learning disabilities. She noted, however,

that he had had no recent behavior problems. His ADHD was deemed to be well-managed with his current medication.

In February 1998, Robert's grandmother reported that Robert was having behavioral problems in the evening and difficulty sleeping at night. In response, his medication was increased.

On March 9, 1998, George Thompson, M.D. and Wynona Murray, M.S., A.R.N.P. of the Menninger Clinic prepared a report concerning Robert. In the medical summary, they stated the following:

> Robert has received on-going treatment at the Menninger Community Service Office beginning in September 1995. Problems under treatment are: attention/deficit hyperactivity disorder (ADHD, combined type, severe), physical aggression at home and school and rapid mood swings. The current treatment plan includes medication targeting the behavioral symptoms.

Robert has a diagnosis of functional heart murmur followed by Leone Mattioli, M.D., a pediatric cardiologist at the University of Kansas Medical Center.

The report noted the following under function: Cognitive/communicative—marked; motor—less than marked; personal—marked; and concentration, persistence or pace—marked. The report further noted:

> In addition to the ADHD diagnosis, Robert also has a Reading Disorder and a Communication Disorder. This combination makes learning and communication difficult. He is receiving some special services from his school for reading and has weekly speech therapy. Even with medication for the ADHD symptoms and special services from the school, he continues to experience difficulty in learning and retaining information.

Robert has severe combined type [ADHD]. Even with medication, he has problems regulating his behavior. He can fly into a rage over an insignificant event. The rages include hitting his siblings, throwing things and destruction of property. These problems interfere with the development of healthy family and social relationships.

Robert will require medication and at times one to one supervision to be able to perform with any degree of persistence or pace.

In April 1998, it was reported that Robert's ADHD was well-managed with his current medication with no side effects. There were no significant behavioral problems at school or at home.

In July 1998, Robert's grandmother reported some problems with hyperactivity, impulsiveness and aggressiveness, particularly in the morning. She noted later in July that some mild depressive symptoms were present. Some adjustments in Robert's medication were made as a result of the reports in July. Subsequently, in October 1998, it was reported that Robert was doing well at home and in school. Robert had won a ribbon at the state fair for a project he made.

In December 1998, it was reported that Robert had increased attention problems, particularly in the morning. However, by February 1999, it was reported that Robert had few problems at school. He was, however, continuing to pull out his hair, particularly when he did homework.

Robert was seen at the Family Service and Guidance Center of Topeka on March 8, 1999. At that time, the following assessments were made:

> Potential for violence: Moderate, child previously had access to firearms and knowledge of how to use them; Appearance: Normal and Appropriate; Speech: Quiet but clear; Affect:

Seemed sad; Thought content: Normal and appropriate but denied the presence of any problems in his life; Thought process: Normal and Appropriate; Perception: Normal and Appropriate; Estimated intellect: Average; Insight: Fair; Oriented: X4; Severely/Persistently Mentally Ill No

The report further indicates that Robert (1) "exhibits severe behavioral, emotional, or social disabilities that consequently disrupt the child's or adolescent's academic and developmental progress, family and/or interpersonal relationships . . .;" (2) "has disabilities that have continued for an extended period of time or, on the basis of specific diagnosis by a qualified professional, are judged likely to continue for an extended period of time;" and (3) "has emotional disabilities that cannot be attributed solely to intellectual, physical or sensory deficits." The report stated that Robert's prognosis was "good."

At the hearing before the ALJ on March 16, 1998, Robert's grandmother testified that Robert had been living with her for one year. She noted that Robert had a hard time concentrating. He is expected to do chores around the house, but he sometimes forgets about them. She indicated that he has problems with his motor skills. She noted that he cannot take criticism and that he will often "fly off the handle" when he is subjected to it. She said that he did not have any friends because of his temper. She further noted that he cannot handle stress. He tried to commit suicide about one year ago. She stated that he was in the fourth grade, but that he was only capable of second grade work. He is presently taking Ritalin and Clonidine. She has not noticed any side effects from the medication. She found that it helped him control his temper for a couple hours. She noted that he has had problems at school with his temper. She believed that Robert got into fights once or twice a week at school. She stated that Robert was in special education classes in school for reading, writing and arithmetic.

Robert also testified before the ALJ. He stated his birth date and level of schooling. He noted that he did not like other children very much. He was unable, however, to say why. He thought that other children did not like him because he was "bossy." He suggested that he would "act out" if other boys and girls wanted to do things differently than he wanted to do them. He understood, however, that this was not a good way to act. He stated that he does not get into a lot of fights, but that he has hurt others in a fight and he has gotten hurt in fights. He estimated that he gets into fights at school "just a couple times a year." He said he likes to play video games with his brother. He stated that he wanted to be a wrestler or boxer when he grew up.

George R. Chance, Ph.D. also testified at the hearing. Dr. Chance, who is a psychologist, examined Robert's medical records prior to his testimony. He also heard all of the testimony offered at the hearing. Dr. Chance diagnosed Robert as suffering from ADHD. He also noted a problem with dyslexia, but he did not find it disabling. He made the following assessments, with the understanding that Robert continued his medication: cognitive communication—less than marked; motor functioning—less than marked; social functioning—less than marked; personal functioning—less than marked; concentration, persistence, pace—less than marked. Dr. Chance found that Robert would be competitively employable when he was twenty years old if he remained on his medication.

The ALJ determined that plaintiff had the following impairments: ADHD; a functional heart murmur; dyslexia, non-

severe. He found Robert's grandmother's testimony only partially credible. He determined that Robert's impairments, either singularly or in combination, did not meet or equal a listed impairment. He further determined that Robert did not have a medically determinable physical or mental impairment, or combination of impairments, which resulted in marked and severe functional limitations. Accordingly, he concluded that Robert was not disabled.

## IV.

■ Plaintiff contends that the ALJ's decision is not supported by substantial evidence. Plaintiff specifically argues that the ALJ's findings concerning the impact of ADHD on his cognitive/ communicative functioning, social functioning, personal functioning and concentration, persistence and pace are not supported by substantial evidence. Plaintiff asserts that the ALJ failed to properly consider the reports of Robert's treating physicians and accorded too much weight to the opinions of a non-examining physician and an examining consultative physician. Finally, plaintiff contends that the ALJ erred in his credibility assessment of Robert's grandmother.

The ALJ focused primarily on whether Robert met the listed impairment for ADHD. Such an analysis was appropriate since Robert's other conditions were non-disabling. Contrary to the argument made by plaintiff, the court does not find that the ALJ failed to properly consider Robert's dyslexia or overlooked its impact on his other impairments.

The relevant listing identifies ADHD as "manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.11. To meet or equal § 112.11, claimant must satisfy both parts A and B. Part A requires medically documented findings of marked inattention, marked impulsiveness, and marked hyperactivity. See *id.* Part B requires that two of the criteria in § 112.02B2 be met:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

The court has carefully reviewed the medical evidence in this case. The court finds that substantial evidence exists to support the findings made by the ALJ. The medical evidence supports the ALJ's conclusions concerning Robert's medical problems. The record demonstrates that Robert's heart problems and dyslexia are

not severe. The record further supports that Robert's ADHD has been adequately controlled by medication. The medication program has resulted in continued improvement in Robert's behavioral problems. The record contains substantial evidence supporting the ALJ's conclusion that Robert's limitations in part B of § 112.11 are not marked.

Plaintiff's primary complaint is that the ALJ failed to properly consider the opinion of Robert's treating physician and gave too much weight to non-examining and state agency physicians. We must disagree. An ALJ is required to give controlling weight to a treating physician's opinion about the nature and severity of a claimant's impairments if it is well-supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record. *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir.1995). "The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled." *Goatcher v. United States Dept. of Health & Human Services*, 52 F.3d 288, 290 (10th Cir.1995). Here, the ALJ carefully considered the opinion of Dr. Thompson and rejected it because he did not find that it was supported by the totality of the medical evidence, particularly the records of the Menninger Clinic. The court finds substantial support for the conclusion reached by the ALJ.

Generally, the opinions of nonexamining doctors are given less weight than those of examining doctors, but that does not mean opinions of medical advisors are entitled to no weight. See *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995); see also *Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir.1987) (reports of reviewing doctors are given less weight than those of examining doctors). Although the treating doctor's opinion regarding the severity of a claimant's impairments is generally favored over that of a consulting doctor, the ALJ here did not give inappropriate weight to the consulting doctors.

Finally, the plaintiff argues that the ALJ failed to properly consider the credibility of Robert's grandmother. Again, we must disagree. The ALJ considered the grandmother's testimony and concluded it was only partially credible. The court recognizes that the ALJ is "optimally positioned to observe and assess witness credibility." *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir.1996) (quotation omitted). Therefore, the court may overturn such a credibility determination only when there is conspicuous absence of credible evidence to support it. See *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992). The court finds that the ALJ properly referred to the grandmother's testimony when it was appropriate. The court finds that he properly assessed her credibility.

In sum, the court finds that the ALJ's decision is supported by substantial evidence. Accordingly, the decision of the ALJ must be affirmed.

**IT IS SO ORDERED.**