**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 10, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

WILLIAM CANDELARIO,

      Plaintiff-Appellant,

  v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant-Appellee.

No. 05-1222
(D.C. No. 04-WM-65 (MJW))
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **PORFILIO**, and **BRORBY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

---

[*]     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff William Candelario appeals from an order of the district court affirming the final decision of the Commissioner of Social Security denying him disability insurance benefits (DIB). We have jurisdiction over this appeal pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 1291 and AFFIRM.

## I. Background

Mr. Candelario was born in 1954. Since completing the eleventh grade, he has worked as a roofer. He filed an application for DIB on April 24, 1998, alleging an onset date of August 5, 1997, when he injured his lower back. The Commissioner denied his application initially and upon reconsideration. After a hearing, an administrative law judge (ALJ) denied his claim. The Appeals Council vacated the ALJ's decision and remanded for consideration of additional evidence.

After consideration of the additional evidence and a second hearing, the ALJ again denied the claim. He found that Mr. Candelario had degenerative disc disease of the lumbar spine that was severe but did not meet or medically equal the criteria for any impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Listings), specifically Listing 1.04, Disorders of the Spine.[1] He also found that Mr. Candelario could not return to his past relevant work. At the

---

[1] The Listings describe "impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. § 404.1525(a).

hearing, a vocational expert (VE) testified that, if restricted to occasional lifting of twenty pounds, frequent lifting of ten pounds, no bending, and a sit/stand option, Mr. Candelario could perform a number of jobs that exist in the national economy: final assembler, lens inserter, film touch up inspector, touch up screener of printed circuit boards, addresser, and order clerk. Relying on the VE's testimony, the ALJ determined that, at step five of the five-step sequential evaluation process, *see Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (explaining five-step sequential process for evaluating claims for disability benefits), Mr. Candelario was not disabled. The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision, which the district court affirmed. This appeal followed.

## II. Standard of Review

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). "Although a reviewing court cannot weigh the evidence and may not substitute its discretion for that of the agency, it nevertheless has the duty to meticulously examine the record and make its determination on the record as a whole." *Dollar*

*v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). "[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### III.  Discussion

Mr. Candelario advances the following arguments on appeal:  (1) his impairment meets Listing 1.04(A); (2) the ALJ erred in his treatment of certain medical evidence; and (3) the ALJ's hypothetical to the VE was not supported by substantial evidence.[2]  Before turning to each argument, we note that, to obtain DIB, Mr. Candelario must establish that he was disabled prior to the date his insured status expired, December 31, 2000.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990) (per curiam). Accordingly, the only evidence relevant to his claim is that which pertains to his condition on or before that date.[3]

---

[2]    In one conclusory sentence, Mr. Candelario argues that he "would assert that the numbers of jobs set forth by the VE were insufficient."  Appellant's Substitute Opening Brief (Aplt. Br.) at 26.  This argument is waived.  *See Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1558 n.1 (10th Cir. 1992) (holding that an issue mentioned in a brief but not addressed is waived), *modified on other grounds on reh'g*, 995 F.2d 992 (10th Cir. 1993) (en banc).

[3]    Mr. Candelario does not dispute the Commissioner's assertion that his insured status expired on December 31, 2000.

**A. Whether Mr. Candelario's impairment meets Listing 1.04(A).**

Mr. Candelario bears the burden of establishing that his impairment meets or equals Listing 1.04(A). *See Doyal*, 331 F.3d at 760. Listing 1.04(A) reads:

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.04.

In reaching his finding that Mr. Candelario's impairment did not meet or equal Listing 1.04(A), the ALJ extensively reviewed the medical evidence, including the testimony of Dr. Clayton, a medical expert who testified by telephone at the hearing. Dr. Clayton stated that, based on his review of the evidence, Mr. Candelario did not meet Listing 1.04(A) because he "doesn't have any neurologic abnormalities on examination." Aplt. App. at 357.

Mr. Candelario summarily cites to a variety of medical evidence that, he claims, shows he meets Listing 1.04(A).[4] Although it appears from the record

---

[4]    Without specific explanation, Mr. Candelario broadly directs our attention to Aplt. App. at 168-180, 192-93, 199-201, 241, 250-54, 256-59, 262-65, 269,

(continued...)

that he satisfies Listing 1.04(A)'s threshold requirements (spinal stenosis, degenerative disc disease, and an old vertebral fracture that resulted in compromise of a nerve root or the spine), the record does not contain significant evidence that shows he meets the additional requirements of Listing 1.04(A). To the contrary, there is substantial evidence supporting the ALJ's finding that he does not meet Listing 1.04(A).

The medical records show that, for a period of time after Mr. Candelario's injury, he had some radiculopathy and loss of strength and sensation on certain occasions, but his neurological tests were normal. At his initial exam on August 6, 1997, Dr. Carvalho, one of his treating physicians, noted "some decreased sensation in the right foot" and "some radicular symptoms which may relate to some foraminal narrowing," but x-rays revealed nothing that appeared acute. Aplt. App. at 200. One month later, Dr. Robbins read the results of a magnetic resonance imaging (MRI) test and noted that "there is no compromise of either exiting L4 nerve root." *Id.* at 194. On multiple occasions from September 1997 through January 1998, Dr. Aschberger, another of Mr. Candelario's treating physicians, noted that his reflexes, strength, motor tests, and neuromuscular tests were intact or normal and that there were no neuromuscular deficits. *See id.* at

---

[4](...continued)
275, 277-79, 281-86, and 288-319 in support of this argument.

171, 176, 180, 185, 187, 189, and 193.  He also reported "[s]traight leg raising is noted to be markedly limited bilaterally, and essentially nonphysiologic."  *Id.* at 168.

An examination in November 1997 by Dr. Ogsbury of Rocky Mountain Neurosurgery showed normal neurological functioning despite a diagnosis of lumbar nerve root irritation syndrome.  *See id.* at 268-69.  In January 1998, Dr. Carvalho noted some decreased sensation and loss of strength.  *Id.* at 172.  In March, Dr. Harder found that Mr. Candelario's "sensory and motor examinations are intact."  *Id.* at 251.  He assigned him a 25% whole body impairment rating, restricted him to occasional lifting of fifteen to twenty pounds, and opined that he could not work at jobs that required frequent flexion, extension, and twisting movements of the spine.  *Id.*  He thought Mr. Candelario could sit for periods of fifty minutes and stand for periods of twenty-five minutes.  *Id.*

Dr. Douthit's April 1998 exam revealed that "[r]eflexes were brisk and equal.  There is no motor or sensory loss. . . . There is no evidence of atrophy of his legs."  *Id.* at 257.  In August, Dr. Finch found limited range of motion along with "evidence of L4-5 radicular pain . . . .  Some of his pain response may be exaggerated, but he does appear to be in honest discomfort.  He probably has more strength in the hamstrings and quadriceps than he [is] reporting, but does appear to be reduced."  *Id.* at 264.  Also in August 1998, a non-examining State

agency medical consultant determined that Mr. Candelario could lift or carry twenty pounds occasionally and ten pounds frequently, could stand at least two hours and sit at least six hours in an eight-hour work day, and had some postural and environmental limitations. *Id.* at 157-60.

In May 1999, over eight months later, Dr. Harder examined Mr. Candelario. He noted that his March 1998 "neurologic examination [that sensory and motor examinations are intact] has not changed" and Mr. Candelario's whole person impairment rating "remains 25%." *Id.* at 266. On July 23, 1999, Dr. Aschberger performed electrodiagnostic testing on Mr. Candelario. Although the study was limited due to poor muscle activation, he found that bilateral lumbar paraspinal levels showed no abnormal potentials, the left lower extremity showed no acute potentials, and his study on motor unit action potentials was incomplete due to poor effort on muscle contraction. *Id.* at 276. He noted "lots of breakaway weakness and complaints of irritation in both legs and his back." *Id.*

On September 30, 1999, Dr. Aschberger reviewed a myelogram and a CT scan. He reported that "[d]egenerative disc changes were noted at L4-L5 with stenosis and impingement of the left L5 and S1 nerve roots. . . . Examination today shows intact reflexes and overall strength." *Id.* at 273. Dr. Wong's November 1999 exam showed normal gait and minimal spasms, some (but not major) radiculopathy, and "[s]traight leg raising 80 degrees bilaterally with no

root tension." *Id.* at 277-78. He also found that "[m]uscle bulk, motor power, sensation and deep tendon reflexes in the lower extremities [were] all grossly intact except for trace ankle jerks bilaterally." *Id.* at 278.

As the foregoing review of the record shows, there was no indication of nerve root compression until September 1999. Moreover, when the compression did occur, there was no evidence of "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and . . . positive straight-leg raising test (sitting and supine)[,]" as Listing 1.04(A) requires. The only additional records that concern Mr. Candelario's back impairment prior to the expiration of his insured status are those dated October 17, 2000, and December 5, 2000, which list Dr. Askenazi as the primary care provider. Nothing in those records indicates that Mr. Candelario meets Listing 1.04(A).[5] We conclude, therefore, that substantial evidence supports the ALJ's determination that Mr. Candelario's impairment did not meet or medically equal Listing 1.04(A). The ALJ's treatment of the medical evidence, discussed below, does not alter our conclusion.

**B. Whether the ALJ erred in his treatment of the medical evidence.**

---

[5] As discussed below, other medical records that list Dr. Askenazi as the primary care provider do not concern Mr. Candelario's condition during the relevant time period.

An "ALJ may not pick and choose which aspects of an uncontradicted medical opinion to believe, relying on only those parts favorable to a finding of nondisability." *Hamlin v. Barnhart*, 365 F.3d 1208, 1219 (10th Cir. 2004). Nor may an ALJ substitute his own medical opinion for that of a claimant's treating doctors. *Id.* at 1221. Mr. Candelario argues that the ALJ violated these precepts when considering the medical opinions of Drs. Harder, Finch, Dasler, Douthit, Askenazi, and Aschberger. He also contends that the ALJ relied on the opinion of the non-examining medical expert, Dr. Clayton, while disregarding the contrary opinions of treating physicians. *See* 20 C.F.R. § 404.1527(d)(2) (stating that a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record"). We consider each of these issues in turn.

Mr. Candelario argues that the ALJ mischaracterized the results of Dr. Harder's 1998 examination as "normal" when in fact Dr. Harder had diagnosed degenerative disc disease. Although we agree that the characterization was in error, the ALJ recognized Dr. Harder's diagnosis in reaching his finding that Mr. Candelario has severe degenerative disc disease but not of Listing-level severity. Therefore, the ALJ's misstatement had no bearing on his decision.

-10-

Mr. Candelario contends that the ALJ substituted his own medical judgment for Dr. Finch's by misreading a comment that "[s]ome of his pain response *may* be exaggerated," Aplt. App. at 264 (emphasis added), as "some of the pain response *was* exaggerated," *id.* at 22 (emphasis added), and by misattributing an additional finding to Dr. Finch, that Mr. Candelario did not cooperate fully with testing. He also argues that the ALJ completely disregarded most of Dr. Finch's medical findings as well as his statement that Mr. Candelario was in honest discomfort. These observations are not completely accurate. The ALJ recognized Dr. Finch's objective functional assessment of L4-5 radicular pain with some loss of strength. *Id.* His finding of a severe impairment is not inconsistent with Dr. Finch's finding of limited range of motion and honest discomfort. Additionally, the ALJ explained that Dr. Finch's conclusion that Mr. Candelario's work capacity was significantly limited "appeared to be a regurgitation of the claimant's subjective complaints, and does not specifically establish restrictions in the claimant's exertional capacities." *Id.* at 27. Thus, it is clear that the ALJ considered Dr. Finch's findings in his step three analysis, and he provided an explanation for not completely accepting Dr. Finch's conclusion about Mr. Candelario's exertional capacity. The other errors in the ALJ's review of Dr. Finch's report are, therefore, insignificant.

We also reject Mr. Candelario's contention that the ALJ erred by misattributing to Dr. Dasler a statement that Mr. Candelario exaggerated his symptoms and limitations. This contention appears to arise from the following sentence of the ALJ's written decision: "The record includes evidence suggesting that the claimant had exaggerated symptoms and limitations as noted by Dr. Finch and Dr. Dasler, who concluded that the claimant's mild depressive symptoms appeared to intensify his subjective experiences of pain." *Id.* at 26. Reading this sentence in full, it is evident that the ALJ did not misunderstand Dr. Dasler's opinion but, to the contrary, was fully aware of her finding about the effect of Mr. Candelario's mild depressive symptoms on his subjective pain. Mr. Candelario also contends that Dr. Dasler's opinion that he was incapable of even part-time work conflicts with the ALJ's ultimate conclusion. However, Dr. Dasler examined him in March 2002, significantly after the date he was last insured. Therefore, that opinion is irrelevant.

We disagree with Mr. Candelario that the ALJ substituted his own medical opinion for Dr. Douthit's by stating "[h]ad the level of pain and inactivity been as the claimant described it, Dr. Douthit would have seen evidence of atrophy upon examination, however, he did not[,]" *id.* at 25. Rather, this statement represents the ALJ's conclusion that Mr. Candelario's subjective complaints were not supported by objective medical evidence.

-12-

Mr. Candelario also argues that the ALJ should have given controlling weight to two letters written by Dr. Askenazi dated February 2002 and December 2002. In the February letter, Dr. Askenazi opined that Mr. Candelario's symptoms have precluded him from working. In the December letter, he stated that diagnostic tests performed in 2001 show results similar to those obtained in 1999, and he concluded that Mr. Candelario was permanently disabled in 1999. This argument is not persuasive. The letters significantly post-date the relevant time period. In the absence of evidence of actual disability, a treating physician's retrospective diagnosis is insufficient to establish a disability. *Potter*, 905 F.2d at 1348-49. Because the record does not otherwise indicate that Mr. Candelario was disabled prior to the expiration of his insured status at the end of 2000, Dr. Askenazi's retrospective extrapolation of test results from 2001 to Mr. Candelario's condition in 1999 is insufficient to do so. Accordingly, the ALJ's failure to give either letter controlling weight was not error.

Mr. Candelario also takes issue with Dr. Aschberger's January 30, 1998, opinion that his finding of marked limitations in lumbosacral range of motion was inconsistent with previous examinations. According to Mr. Candelario, prior exams also showed marked limitations in lumbosacral range of motion. Therefore, he argues, the ALJ should not have relied on Dr. Aschberger's statement. Assuming Mr. Candelario is correct that Dr. Aschberger's finding was

consistent with the results of prior exams, the ALJ's recognition of this fact would not have affected his decision that Mr. Candelario is not disabled because it is merely additional consistent evidence of the severe impairment the ALJ found.

We agree that there is no record that supports the ALJ's assertion that Dr. Aschberger was unable to complete an examination on September 17, 1997, due to Mr. Candelario's guarding and uneasiness with the examination procedures. However, this error has no particular significance to the ALJ's findings with regard to Listing 1.04(A) or Mr. Candelario's residual functional capacity (RFC).

Finally, we disagree with Mr. Candelario's suggestion that the ALJ relied substantially on the opinion of the non-examining medical expert, Dr. Clayton, that Mr. Candelario did not meet Listing 1.04(A), while rejecting the contrary opinions of Drs. Harder, Finch, and Askenazi. The ALJ relied on his entire review of the medical evidence, including Dr. Clayton's testimony. Dr. Clayton's testimony does not conflict with the opinions of Drs. Harder, Finch, and Askenazi because none of them found conditions that meet all the requirements of Listing 1.04(A). Furthermore, even if Dr. Clayton had not testified, there would still be substantial evidence supporting the ALJ's decision.

**C. Whether the RFC accounts for all of Mr. Candelario's limitations.**

Mr. Candelario testified that, about one year prior to the June 2002 hearing, he began to need to lie down five or six times a day for up to one hour each time. *See* Aplt. App. at 374. When the ALJ asked the VE to assume a person had to lie down five or six times a day for up to one-half hour, a lesser limitation, the VE testified that none of the jobs he identified would be available. As the ALJ recognized, however, the asserted limitation began after the relevant time period. Even if it was relevant, the ALJ explained that the limitation was inconsistent with the record evidence. Accordingly, he properly disregarded the VE's testimony on this point. *See Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993) (holding that testimony premised on limitations unsupported by the evidence is not binding on an ALJ).

Mr. Candelario also takes issue with the ALJ's treatment of the VE's testimony that, "[a]s long as the individual can perform the job task, meet the criteria for production quotas and quality assurance[,] the sit, stand option is available." Aplt. App. at 389. He contends that no evidence was presented "to confirm that [he] could meet such standards." Aplt. Br. at 26. However, the ALJ's RFC finding does not contain any limitations related to production quotas or work quality, and nothing in the record supports such limitations. The ALJ,

therefore, was not bound by the VE's statement.  *See Gay*, 986 F.2d at 1341.

The judgment of the district court is **AFFIRMED**.

Entered for the Court

Wade Brorby
Circuit Judge